URBAN DEVELOPMENT
SOLUTIONS, LLC,
Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

No. 07–CV–1426.

District of Columbia Court of Appeals.

Argued May 5, 2009.
Decided April 15, 2010.

Raymond D. Battocchi, with whom Aaron S. Book, Steven Webster, Alexandria, VA, and Walter Fleischer, McLean, VA, were on the brief, for appellant.

William J. Earl, Senior Assistant Attorney General, D.C., with whom Peter J. Nickles, Acting Attorney General at the time the brief was filed, and Todd S. Kim, Solicitor General, D.C. and Donna Murasky, Deputy Solicitor General, were on the brief, for appellee.

Before REID, KRAMER and OBERLY, Associate Judges.

REID, Associate Judge:

This case concerns Urban Development Solutions, LLC's ("UDS") bid proposal challenge to the District of Columbia's selection of another firm to purchase and develop District-owned land adjacent to a subway station. The trial court dismissed UDS's lawsuit on the ground that the selection committee enjoyed absolute immunity. UDS appealed; it contends that the District is not shielded by absolute immunity in this case. The District concedes that it does not have absolute immunity; it argues, however, that it is entitled to judgment as a matter of law on UDS's claims. UDS takes the position that this court should resolve all outstanding issues where there are no disputes of material fact. We conclude that on this record the District is entitled to judgment as a matter of law, and hence, we affirm—on different grounds—the trial court's judgment dismissing UDS's lawsuit.

## PROCEDURAL SUMMARY

The record before us shows that in August 2002, the District issued a Request for Expression of Interest ("RFEI") in the development of land located at the Georgia Avenue–Petworth Metro Station ("the Georgia Avenue Project"). UDS expressed interest in developing a retail/residential complex on the site. Subsequently, the District published a Request for Proposals ("RFP") on August 1, 2003, after the Council of the District of Columbia approved the disposition of the land through an RFP process. The RFP called for a mixed residential development, with retail establishments and community amenities. It also set forth specific submission requirements and criteria for evaluating proposals. In February 2004, the District notified Petworth Investment Partners ("PIP")/UDS, one of the bidders, of its decision to select Donatelli & Klein ("D & K") and Petworth Metro Ventures ("PMV") as the developer of the site. UDS informed the District of its decision to protest the selection of D & K and PMV.

On September 30, 2004, UDS filed its complaint against the District seeking (1) injunctive relief to compel the District (a) to award the Georgia Avenue Project to UDS, or (b) to conduct a new procurement process (Count I); (2) a declaratory judgment that the procurement process resulting in the selection of D & K and PMV was flawed (Count II); and (3) damages and attorneys' fees (Count III). The trial court denied injunctive relief. UDS lodged an amended complaint against the District in early 2005. The amended complaint incorporated UDS's initial complaint by reference and added the following new claims: (1) breach of an implied contract to "process bids fairly and in good faith, and award the project to the bidder earning the highest score when the bids were reasonably judged" (Count IV); (2) promissory estoppel based upon an implied promise to administer the selection process fairly and in good faith (Count V); (3) violation of D.C.Code § 10–801 pertaining to the disposition of real property owned by the District, due to the District's alleged "bad faith and illegal conduct" (Count VI); (4) intentional torts, accusing the District of "rigging the award process" and acting "fraudulently, collusively, in bad faith, and arbitrarily and capriciously" (Count VII); (5) deprivation of UDS's "vested right" in the Georgia Avenue Project (Count VIII); (6) unjust enrichment of D & K and PMV (Count IX); (7) conspiracy "to commit the various violations alleged" in the prior

counts and "to damage UDS ... and to deprive UDS of the award to which it was entitled" (Count X).[1] UDS sought lost profits, estimated at $15,000,000, bid preparation expenses of approximately $241,805, punitive damages, attorneys' fees, costs, and other appropriate relief.

The District filed its first motion to dismiss the complaint for lack of jurisdiction on November 29, 2004, arguing mainly that the trial court had no subject matter jurisdiction to review the actions of the Mayor and Council relating to the discretionary disposition of the District's surplus real property. The Honorable Neal E. Kravitz orally denied the District's motion on December 17, 2004, after determining that the trial court had subject matter jurisdiction under the applicable statute. The District lodged another motion to dismiss on March 4, 2005, contending that UDS failed to provide timely notice of its claim to the District, in accordance with D.C.Code § 12–309 (2001). In the alternative, the District requested summary judgment on UDS's claims concerning alleged conspiracy, intentional torts, promissory estoppel, implied contract, and vested rights. Judge Kravitz denied the motion on July 27, 2005.[2]

In March 2006, the case was reassigned to the Honorable Mary A. Gooden Terrell. Following discovery, the District filed a July 20, 2006 motion to dismiss UDS's amended complaint for lack of jurisdiction,[3] and for failure to state a claim upon

---

1. UDS added D & K and PMV as defendants, but UDS, D & K and PMV resolved their dispute in Fall 2006.

2. Judge Kravitz's order did not address the alternative motion for judgment as a matter of law on the specified UDS claims. Judge Kravitz also denied the District's August 12, 2005 motion for relief from the court's July 27 ruling, with respect to its analysis of the D.C.Code § 12–309 issue. The District filed an interlocutory appeal in this court pertain-

ing to the § 12–309 notice issue, but we dismissed the interlocutory appeal.

3. Initially, the District argued that UDS failed to exhaust its administrative remedies by first presenting its claims to the Contract Appeals Board ("CAB"); therefore, the trial court lacked jurisdiction. Later, the District acknowledged that the CAB does not have jurisdiction over claims pertaining to the disposition of District-owned surplus property. *See* D.C.Code § 10–801 (2001); D.C.Code § 2–

which relief can be granted.[4] The District also maintained, in part that, because of a lack of evidence, it was entitled to judgment as a matter of law on all of UDS's counts alleging "bad faith or unjust conduct," and on UDS's demand for punitive damages because no evidence substantiated "egregious conduct" by the District.

On April 27, 2007, Judge Terrell denied the District's motion to dismiss or, in the alternative, for summary judgment, in part, because as to Counts III—X, "the record contains genuine factual disputes regarding several material issues, including but not limited to whether defendant breached an implied contract, whether the award was made in bad faith, whether unjust enrichment occurred, and whether defendant violated statutory provisions." The court declared that Count II (declaratory judgment) was moot due to resolution of the injunctive relief claim, and that UDS "agreed to withdraw its claims for punitive damages and attorneys' fees." In its motion for reconsideration, filed on July 3, 2007, the District pressed its argument that the UDS's lawsuit should be dismissed because the District enjoyed absolute immunity.

While awaiting the trial court's response to the District's motion for reconsideration, the parties moved closer to trial. The District filed a Motion in Limine, on September 8, 2007, in an effort to preclude UDS from presenting evidence at trial on several issues, including "bad faith." The parties followed the District's filing with an eighty-six page Joint Pretrial Statement on September 18, 2007. The statement listed UDS's remaining claims as:

Count [III]: Damages for bid preparation costs;

Count [IV]: Implied contract;

Count [V]: Promissory estoppel;

Count [VI]: Statutory violation (D.C.Code § 10.1–801);

Count [VII]: Intentional torts;

Count [VIII]: Vested rights;

Count [IX]: Unjust enrichment;

Count [X]: Conspiracy.

The District's "affirmative defenses" included "reasonable" and "lawful" actions "within scope of employment" and "in accord with law." UDS identified ninety-nine allegedly disputed issues but highlighted the following in its overview of those issues:

(1) whether [D & K's] response to the District's RFP was so non-responsive that [D & K] should have been eliminated altogether from consideration for the award; (2) whether [D & K] was improperly permitted to change its bid in the middle of the scoring process, while UDS was not provided the same opportunity to do so; and (3) whether the responses to the RFP were improperly scored, resulting in UDS receiving a lower total point score than [D & K].

The District responded to UDS's assertion of disputed issues by attempting to demonstrate that the evidence supported its legal position, or that UDS should not be allowed to introduce certain evidence.

Judge Terrell issued an order on December 12, 2007, granting the District's motion for reconsideration. She concluded that "the 'sole discretion' decision-making

---

309.03(a)(1) (2001); *Francis v. Recycling Solutions, Inc.,* 695 A.2d 63, 88 (D.C.1997) ("[T]he CAB initially has jurisdiction over protests of contract awards.") (citations omitted).

4. The District argued that it was entitled to judgment under Super. Ct. Civ. R. 12(b)(6) because the deposition testimony showed no evidence of its bad faith in consideration of UDS's proposal, and hence, Counts IV, V, VI, VII, IX and X should be dismissed as a matter of law.

authority of the selection committee is a function of the executive branch and as such should be protected under a grant of absolute immunity." UDS filed a timely notice of appeal.

## ANALYSIS

### *The Factual Context: The Procurement Process and the Selection of D & K*

We first set forth the factual context for our analysis. In her deposition of January 23, 2006, Anita Morrison, a principal with Bay Area Economics ("BAE"), indicated that she had worked with the Office of the Deputy Mayor for Planning and Economic Development ("DMPED") on a contract basis in 1999 or 2000. At the time, DMPED was examining "opportunities to use government offices in the neighborhoods to spur economic development." One of the proposed centers, the Department of Motor Vehicles, was to be located at the Petworth metro site.[5] Later, BAE became a subcontractor on a District government contract (Office of Planning ("OP")) relating to that site. Part of BAE's task was to examine the "market for rental office and residential development" at the site. Later, as part of BAE's contractual work with OP and DMPED, Ms. Morrison had input into the development of the RFP. She reviewed the three proposals submitted in response to the RFP for the Georgia Avenue Project and

prepared an analysis for DMPED, which she submitted on December 1, 2003. Her comparative analysis, which focused on "affordable housing," "price/required subsidy," "housing market support," "retail development," "risk to the District," and "community amenities," discussed but did not rank the proposals.

The RFP stated that a Selection Committee would be established to "review and grade the submissions on a scale of 100 points." "[A]t its sole discretion," the Committee would "select one of the proposals." The RFP called for a Committee of four persons to rate the proposals; they were to be drawn from the following offices and agencies: DMPED, OP, DHCD (Department of Housing and Community Development), and DDOT (Department of Transportation). The RFP specified that the Committee would include an ex-officio, non-voting member of the community. Des Bracey, a special assistant to the DMPED assigned to work with the Committee, chose the members "based on the respective expertise they could bring to the task of evaluation." [6]

The fundamental purpose of the RFP was to obtain a developer for the Georgia Avenue–Petworth Metro Station site who would develop the site consistent with certain design goals and principles formulated by the District and the community surrounding the site.[7] The document con-

---

**5.** The District purchased the Petworth site from the Washington Metropolitan Transit Authority ("WMATA") early in 2002 for $900,000.

**6.** Those rating the proposals were: Lars Etzkorn, Associate Director, DDOT; Toni Griffin, Deputy Director, OP; Michael Jasso, Special Assistant for Tax Increment Finance, DMPED; and Victor Selman, Deputy Chief, Finance Division, DHCD. The community representative was Andrew McGilvray from the Georgia Avenue/Petworth Steering Committee.

**7.** Examples of the design principles in section 3.2 of the RFP included: "Development adds new residents to the Petworth neighborhood, brings diversity to the community and includes an affordable component"; and "Any new development is completed within two and a half years of the selection of developer." The timely completion of the project was important because WMATA retained the right of re-entry to the site. When use of the site changed from a government office to a residential/retail structure, WMATA imposed

tained three program elements in section 3.4: housing, retail, and parking. Under housing, the RFP "envisioned" "100 units minimum" and indicated that "[t]he community has expressed a preference for home ownership for residential development." "Retail" called for a minimum of 17,000 square feet on the ground floor; and as to parking, "[d]evelopment teams [were] encouraged to consider and propose parking alternatives."

The RFP detailed the submission requirements, the selection process, the evaluation criteria, the pre-proposal meeting, and the Committee's authority to develop questions and request responses from bidders. In addition to other information, the RFP stated, in part, in section 4.1: "[f]or a submission to be complete, the [b]idder must submit" information regarding: (1) its qualifications, experience and the financial feasibility of the project; (2) financial compensation (details about the financial offer and "any limiting conditions"); (3) details about the elements of the proposed development "and the rationale for the particular architectural solution proposed"; and (4) a plan for the use of local, small and disadvantaged business enterprises ("LSDBE") as well as a plan for employment opportunities and community outreach.[8] Section 4.1 expressly stated: "Should the Government of the District of Columbia require additional material, it will request the authorized representative [of the bidder] to furnish the necessary information." The RFP also highlighted six evaluation criteria in section 4.3 and the points to be assigned to each criterion (based on a total of 100 points):

| | |
|---|---|
| Qualifications, Experience and Financial Feasibility | 25 |
| Development Program and Concept Plans | 20 |
| Design Excellence | 15 |
| Financial Compensation | 15 |
| LSDBE Participation | 15 |
| Community Responsiveness | 10 |

Section 4.3.4 specified: "The proposing team's financial offer for either sale or ground lease will be evaluated in Present Value terms. Dependence on public subsidy will be included in the evaluation. Scoring will be proportional to the highest bidder." Section 4.3.6 highlighted the importance of community input and stated that the proposals "will be scored based on achieving ... community objectives" relating to "parking/traffic management"; "home ownership"; the amount of space allocated to retail enterprises; and community amenities. According to section 4.5 of the RFP, the selected developer would be given ninety calendar days in which to "reach agreement [with the District] on the construction schedule and construction milestone dates, any outstanding business and financial terms," and other matters.

D & K, UDS, and a third entity, submitted proposals on October 31, 2003. D & K's proposal "anticipated the entire project as a rental building, with [D & K] as a long-term owner," but D & K's proposal stated: "If a For–Sale component is the final preference by the Selection Committee and Community, we have the flexibility to sell the townhouse units and/or the remaining 141 units. If the current economic conditions are present at project delivery, that may be a worthy option for all to consider." D & K's proposal did not rely on "public financial subsidies." UDS proposed a mix of apartments and condominium units, and stated in its proposal letter: "We require that the lot and improve-

as one condition of its non-re-entry the timely development of the site.

8. The submission requirements section contains the following statement: "The Govern-

ment of the District of Columbia reserves the right to reject any proposal it deems incomplete or unresponsive to the submission requirements at its sole discretion."

ments that comprise the rental components be granted a 10–year, 100% real property tax abatement on the incremental property taxes generated by the project in accordance with 'High Rent Area' provisions of the District of Columbia Housing Act of 2002, in order to bring investment return on this component up to acceptable levels."

Consistent with the RFP, D & K and UDS made oral presentations of their proposals to the Selection Committee on November 12, 2003, and at a Petworth community meeting on November 24, 2003. Committee follow-up questions were sent both to D & K and UDS via e-mail on December 4, 2003, through Mr. Bracey. D & K was asked, in part, (1) to confirm that it could provide condominiums for the project, without "affect[ing] the price offered to the District for the land, the provision of affordable housing units per the RFP's requirements, or the absence of a public subsidy for the project"; and (2) to "address [its] ability to manage multiple simultaneous projects" (the Georgia Avenue Project in Petworth as well as two projects in Columbia Heights). D & K replied on December 8, 2003. The Committee's questions to UDS, through Mr. Bracey, sought,

in part: (1) "more detailed evidence of [UDS's] ability to finance the [Georgia Avenue Project] as proposed"; and (2) "support for [UDS's] assumption of market-rate monthly apartment rents of $2.10–$2.40 per square foot (with parking spaces renting for $145 a month)." After receiving UDS's response, Mr. Bracey sent an additional question to UDS on December 8, 2003, concerning UDS's requirement of a tax abatement. UDS responded to the inquiry that same afternoon.[9]

Two days later, UDS, on behalf of PIP, sent a letter to the DMPED raising the possibility of its protest if the District allowed bidders "to substantially change ... their proposals from that which was originally submitted by them." Subsequently, on December 11, 2003, an architectural firm (Ehrenkrantz Eckstut & Kuhn), sent a memorandum to the DMPED containing the results of its "review of architecture and urban design for the Petworth Metro Station." Based on quality of the submissions in this area, the architectural firm ranked D & K first and PIP [UDS] second.

Mr. Bracey reported the recommendation of the Selection Committee to Eric

9. The additional request stated:
Your proposal letter has the following statement: "We require that the lot and improvements that comprise the rental component be granted a 10[-]year 100% real property tax abatement on the incremental property taxes generated by the project in accordance with 'High Rent Area' provisions of the District of Columbia Housing Act of 2002, in order to bring investment return on this component up to acceptable market levels."
Obviously, it is not within the purview of the selection committee to grant such an abatement. Please clarify whether you consider your offer and proposal conditional upon the grant of the abatement and how you would proceed if the abatement is unavailable.
UDS replied, in part:

We understand that the selection committee is not empowered to grant the described tax abatement, that power being delegated to the Mayor. Since the rental component of the project meets the requirements for this entitlement (and is the only portion to receive the abatement), and the project schedule accommodates the statutory timing, we are confident that this abatement will be certified. Therefore, we are not making our offer and proposal conditional upon the grant of the abatement.
We will apply as early as possible for certification, and if for any reason the abatement is not available, we will modify our financing to accommodate this situation....
UDS outlined an "alternative financing approach in the event the abatement is not available."

Price, Deputy Mayor, DMPED on December 12, 2003. The Committee recommended immediate negotiations with D & K, and further recommended that PIP [UDS] "be designated as the second place developer." The Committee focused on the following aspects of the submitted proposals: housing units (total, rental, and ownership); retail space allocated; parking spaces; dollar amount of land offer; and required District subsidy.[10] The Committee identified the follow-up questions presented to D & K and PIP and set forth their responses. The report included raw and scaled evaluation scores (based on an evaluation matrix) given the proposals by each of the raters; charts were included showing both the original scores and the modified scores after the responses were evaluated. Based on both the raw and scaled scores, three of the raters ranked D & K higher and the fourth rated PIP higher, and both the total raw and scaled scores favored D & K. A comparison of original and modified scaled scores evidences a greater drop from PIP's total original score than D & K's total original score. Prior to consideration of the responses to questions posed by the Committee, D & K's total scaled score was 80; that score dropped to 78.5 after consideration of the responses. In contrast, prior to the questions posed by the Committee, PIP's total scaled score was 72.5, but it dropped to 66.25 after the Committee considered PIP's responses.[11]

The Committee's report explained its recommendation of D & K as follows:

[T]he Selection Committee recommends the [D & K] proposal predominantly due to: 1) An unmatched corporate track record of successfully completing similar residential and mixed-use[ ] projects in the District and elsewhere. The Selection Committee believes that D[ & ]K, as the best qualified and most experienced developer, presents the greatest likelihood that the proposed project will be built on schedule; 2) An architectural design and plan that unanimously was judged the most excellent; and 3) The clearest, least ambiguous statement that its proposed project can be built without reliance on any subsidy in any form from the District.

Additionally, advisory opinions issued by Bay Area Economics, a real estate consulting firm, and Ehrenkrantz, Eckstut & Kuhn, an architectural firm, strongly support the selection of [D & K].

The Committee's report commented on UDS's December 2003 letter raising the possibility of a bid protest due to the alleged possibility that bidders would be "permitted or encouraged to change their proposals prior to selection." The report stated, in part: "All contact between the government and the RFP respondents has been solely for the purpose of clarifying the submitted materials and performing necessary and proper due diligence in evaluating [the] proposals." The report also pointed out that PIP [UDS] arguably ben-

---

10. The proposals called for: D & K 148 total housing units (all rental with flexibility to shift to ownership) and PIP's [UDS] 143 (71 rental and 72 ownership); D & K 17,600 square feet of retail space and PIP 20,100 square feet; D & K 147 parking spaces and PIP 140 spaces; D & K's offer to purchase the site for $1.4 million and PIP's offer for $1.1 million; D & K did not require District subsidy and PIP required a $2.27 million District subsidy ("Ten year, 100% property tax abatement on rental portion of project").

11. The record includes evaluation matrix sheets from each rater showing the allocation of points for criteria listed in the RFP—qualifications, experience and financial feasibility; development program and plan concepts; design excellence; financial compensation; LSDBE participation and employment; and community responsiveness.

efitted from the opportunity to respond to the question concerning the subsidy or tax abatement because two of the raters gave PIP the full ten points in the "District subsidy" category and a third rater awarded PIP five points. The Committee report summarized the rationale for selection of D & K as follows: "It is the judgment of the Selection Committee that the proposal submitted by [D & K] represents the best overall opportunity for the site and is judged to be in the overall best interests of the District."

## The Parties' Arguments

We turn now to the arguments of the parties. In its main brief, UDS contends that the trial court's judgment should be reversed because the District is not entitled to absolute immunity in this case; hence the case should be remanded for trial. In response to UDS's opening brief, the District concedes that the doctrine of absolute immunity does not apply to this case: "UDS has undertaken a bid protest, an equitable proceeding in which there is no entitlement to legal damages and doctrines of absolute immunity from such damages are, therefore, irrelevant." Nevertheless, the District maintains that this court can affirm the trial court's decision to dismiss UDS's lawsuit on other grounds, and that it is entitled to judgment as a matter of law.

In its reply brief, UDS presses its argument that factual disputes preclude judgment as a matter of law in favor of the District. However, UDS indicates that both it and the District "should have an interest in resolving all wholly or partially dispositive questions of law on this appeal."[12] In addition, UDS endeavors to show that it should prevail on its claims in

this matter. UDS attacks certain "unfair" administrative decisions during the selection process that resulted in D & K's selection: "Had the District calculated Present Value as required by the RFP, not given a bidder who never showed responsibility up to 25 points on that issue, not penalized UDS up to 10 points for reliance on the permitted subsidy, and not given [D & K] up to 4 extra points by encouraging it to change its bid to 100% condos, UDS would have scored far higher than [D & K], and been selected." Furthermore, UDS reasserts its bad faith argument against the District by lifting up the evidence supporting judgment in its favor: "UDS'[s] evidence shows, among other things, that District officials made an award to an unresponsive bidder who failed to show its responsibility, surreptitiously allowed [D & K] to change its bid after the offers were opened, rigged the scoring to penalize UDS and favor [D & K], and prepared a recommendation letter to the Mayor supporting [D & K] that made knowingly incorrect statements."

## Applicable Legal Principles

■ Since the District concedes that it is not entitled to absolute immunity, we do not address that issue. Instead, we focus on the District's contention that it was entitled to judgment as a matter of law; hence the trial court improperly denied its alternative motion for summary judgment on April 27, 2007. Although UDS contends that factual disputes preclude judgment as a matter of law in favor of the District, it posited arguments in the trial court, as it does in this court, responding to the merits of the District's contentions and supporting its bad faith and other claims. "Where there will be no procedural unfairness, we may affirm a judgment

12. UDS declares in its reply brief: "If UDS does not have triable claims, or it cannot recover damages, then no point would be served by a remand that needlessly would consume a great deal more time and effort." We agree.

on any valid ground, even if that ground was not relied upon by the trial judge or raised or considered in the trial court." *Chamberlain v. American Honda Fin. Corp.*, 931 A.2d 1018, 1024 n. 11 (D.C.2007) (internal quotation marks omitted) (quoting *National Ass'n of Postmasters of the United States v. Hyatt Regency Washington*, 894 A.2d 471, 474 (D.C.2006) (quoting *In re Walker*, 856 A.2d 579, 586 (D.C.2004) ("no 'procedural unfairness' exists where [as here] appellant 'has had notice of the grounds upon which affirmance is proposed, as well as an opportunity to make an appropriate factual and legal presentation with respect thereto' ")))).

■ In determining whether a party is entitled to judgment as a matter of law, we must satisfy ourselves that "no genuine issue of material fact exists" and "we must ... review the pleadings and other papers" that comprise the record on appeal *de novo. Hefazi v. Stiglitz*, 862 A.2d 901, 908 (D.C.2004) (internal quotation marks and citations omitted). "When the evidence and its attendant inferences, viewed in the light most favorable to the nonmoving party, support but one reasonable conclusion favorable to the moving party, the trial court must grant [a motion for summary judgment or judgment as a matter of law]; otherwise, however, the motion must be denied." *Board of Trs. of the Univ. of the District of Columbia v. DiSalvo*, 974 A.2d 868, 870 (D.C.2009) (internal quotation marks and citation omitted). "[M]ere conclusory allegations by the nonmoving party are legally insufficient to preclude entry of summary judgment" or judgment as a matter of law. *Tobin v. John Grotta Co.*, 886 A.2d 87, 90 (D.C. 2005) (citation omitted). "[T]he non-moving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *LaPrade v. Rosinsky*, 882 A.2d 192, 196 (D.C.2005) (quot-

ing *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). " 'The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party].'" *Id.* (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (alteration in original). "[I]f it is clear that the plaintiff has not established a prima facie case, [we] must grant judgment as a matter of law for the defendant." *DiSalvo*, 974 A.2d at 870 (internal quotation marks and citation omitted).

■ For substantive guiding legal principles in this bid protest case, including our standard of review, we look generally to the decisions of federal courts handling claims pertaining to the federal contracting process. *See Abadie v. District of Columbia Contract Appeals Bd.*, 916 A.2d 913, 919 (D.C.2007). "In a bid protest case, an agency's action must be set aside if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1285 (Fed.Cir.2010) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed.Cir.2005)) (other citation omitted). "The court's task is to determine whether (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Id.* at 1285–86 (internal quotation marks and citation omitted). "Contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." *Id.* at 1286 (internal quotation marks and citation omitted) (alteration in original). "For that reason, procurement decisions invoke[ ] highly deferential rational basis review." *Id.* (internal quotation marks and

citation omitted). "Under that standard, we must sustain an agency action unless the action does not evince[ ] rational reasoning and consideration of relevant factors." *Id.* (internal quotation marks and citation omitted) (alteration in the original).

There are some basic legal principles applicable to this type of solicitation. "An invitation for bids issued by the government carries, as a matter of course, an implied contractual obligation to fairly and honestly consider all responsive bids." *Prineville Sawmill Co., Inc. v. United States,* 859 F.2d 905, 909 (Fed.Cir. 1988) (citations omitted). "A bid is responsive if it conforms with the requirements of the solicitation." *Mack Trucks, Inc. v. United States,* 6 Cl.Ct. 68, 70 (1984) (citations omitted); *American Combustion, Inc. v. Minority Bus. Opportunity Comm'n,* 441 A.2d 660, 671 (D.C.1982). If the response to the request for proposals does not meet the material requirements of the solicitation, it is considered unacceptable. *See Centech Group, Inc. v. United States,* 554 F.3d 1029, 1037–38 (Fed.Cir.2009). "Determination of whether a defect in a bid is material is committed to agency discretion." *Tel–Instrument Elecs. Corp. v. United States,* 56 Fed.Cl. 174, 177 (2003) (citing *Interstate Rock Prods., Inc. v. United States,* 50 Fed.Cl. 349, 362 (2001)).

"Responsiveness addresses whether a bidder has promised to perform in the precise manner requested by the government"; that is, "[a] responsive bid is one that, if accepted by the government as submitted, will obligate the contractor to perform the exact thing called for in the solicitation." *Bean Dredging Corp. & Marine Weeks, Inc. v. United States,* 22 Cl.Ct. 519, 522 (1991) (internal quotation marks and citations omitted). "Material nonconformity goes to the substance of the bid

which affects the price, quality, quantity, or delivery of the article or service offered." *Id.* (citing *Blount, Inc. v. United States,* 22 Cl.Ct. 221, 227 (1990)). "Responsibility addresses the issue of the performance capability of a bidder, which can include inquiries into financial resources, experience, management, past performance, place of performance, and integrity." *Id.* (citing *Blount, Inc.* 22 Cl.Ct. at 227). "In contrast to responsiveness, a bidder may present evidence of responsibility after bid opening up until the time of the award." *Id.* at 522–23 (citing *Blount, Inc.,* 22 Cl.Ct. at 226 (other citation omitted)).

The standard governing proof in a case such as this where claims are based on allegations of governmental bad faith is quite high. "[A] party claiming that the government acted in bad faith must present a reviewing court with well-nigh irrefragable proof to that effect." *District of Columbia v. Organization for Envtl. Growth, Inc.,* 700 A.2d 185, 201 (D.C.1997) (internal quotation marks and citation omitted). " 'Almost irrefragable proof' amounts to 'clear and convincing evidence.' " *Galen Med. Assocs., Inc. v. United States,* 369 F.3d 1324, 1330 (Fed. Cir.2004) (citation omitted). "In the cases where the court has considered allegations of bad faith, the necessary 'irrefragable proof' has been equated with evidence of some specific intent to injure the plaintiff." *Id.* (internal quotation marks and citation omitted).

### Discussion

Since both parties had ample time in the trial court to make their factual record and legal arguments about the merits of UDS's claims, we are satisfied that "there will be no procedural unfairness," *Chamberlain, supra,* 931 A.2d at 1024 n. 11, if we resolve this case on a ground not relied upon by the trial court, the District's entitlement to

judgment as a matter of law. Therefore, we turn now to an application of the articulated legal principles in order to determine that issue. We conclude, in light of the record in this case and the applicable legal principles, that the District is entitled to judgment as a matter of law with respect to all of UDS's remaining claims—implied contract, promissory estoppel, statutory violation, intentional torts, vested rights, unjust enrichment, and conspiracy.

UDS's contentions supporting the viability of its claims generally are premised on two theories: (1) The District should have rejected D & K's bid proposal because it was non-responsive and because D & K was not a responsible bidder; and (2) the District conducted the bid selection process unfairly, illegally, and in bad faith. When viewed in the context of UDS's causes of action and applicable legal principles, UDS maintains that the District's issuance of the RFP included not only an implied contract (Count IV) to process bids fairly, honestly, and in good faith while considering only responsive bids, but also a promise on which it relied to its detriment to conduct the selection properly (Count V). Instead, UDS maintains, the District illegally and in bad faith failed to comply with the pertinent statute and the Council Resolution governing the disposition of the Georgia Avenue Petworth site (Count VI), and further in bad faith as well as fraudulently, the District engaged in intentional torts and rigged the process to ensure that D & K would be selected (Count VII). And, UDS claims, the District and agents of D & K conspired to commit violations (Count X) which deprived D & K of its "vested property rights in having its bid rated as the highest scoring bid," and in receiving the award of the project (Count VIII). When UDS did not receive the award, D & K was unjustly enriched "at the expense of UDS" (Count IX).

We agree with UDS that the District's request for bidders on the development of the Petworth site "carri[ed] [with it], as a matter of course, an implied contractual obligation to fairly and honestly consider all responsive bids." *Prineville Sawmill Co., Inc., supra,* 859 F.2d at 909 (citations omitted). But, the record evidence does not substantiate UDS's argument that D & K's proposal, as submitted, was not responsive and D & K was not a responsible bidder. Our review of the District's procurement decision in this case is "highly deferential" and requires only a "rational basis review," *Savantage Fin. Servs., supra,* 595 F.3d at 1286. Moreover, the agency entrusted with the procurement decision decides "whether a defect in a bid is material," *Tel–Instrument Elecs. Corp., supra,* 56 Fed.Cl. at 177 (citation omitted). Given these principles, we do not perceive any basis in the record for concluding that D & K was not a responsive bidder. The District obviously determined that D & K's proposal "conform[ed] with the requirements of the solicitation," *Mack Trucks, Inc.,* 6 Cl.Ct. at 70, and obligated D & K "to perform the exact thing called for in the solicitation," the development of the Petworth site in accordance with the design goals and principles, development program, and concept plans enunciated in the RFP, *Bean Dredging Corp., supra,* 22 Cl.Ct. at 522. Indeed, the record shows that D & K's proposal narrative followed the major categories set forth in the RFP. Nor do we see any basis for agreeing with UDS's assertion that D & K was not a responsible bidder. Not only did D & K have what the Selection Committee described as "[a]n unmatched corporate track record of successfully completing similar residential and mixed-use[ ] projects in the District and elsewhere," but the record also evidences its responsibility due to its ability to obtain financial re-

sources for its projects and to assemble experienced management and performance teams. *See Bean Dredging Corp., supra,* 22 Cl.Ct. at 522.

■■■■ The record evidence in support of UDS's claims of promissory estoppel, statutory or regulatory violation, bad faith, intentional torts, vested right, unjust enrichment, and conspiracy is woefully thin, generally conclusory, and in part, irrelevant. "[M]ere conclusory allegations by the non-moving party are legally insufficient to preclude entry of summary judgment" or judgment as a matter of law, *Tobin, supra,* 886 A.2d at 90. While "[e]stoppel may be applied against the government in appropriate circumstances," *City of Oxnard v. United States,* 851 F.2d 344, 347 (Fed.Cir.1988), and arguably, the District's RFP embodied a promise to administer the selection process fairly, according to law, and in good faith, UDS has not demonstrated with concrete, credible evidence that the District breached that promise, or that UDS relied upon it in a way that changed its position for the worse, or that its "reliance was reasonable and should have been reasonably expected by [the District]." *Law Mathematics and Tech., Inc. v. United States,* 779 F.2d 675, 678 (Fed.Cir.1985) (citation omitted); *Kauffman v. International Bhd. of Teamsters,* 950 A.2d 44, 49 n. 7 (D.C.2008). Similarly, UDS has not offered concrete, credible evidence of fraudulent misrepresentation on the part of the District, apparently the only intentional tort mentioned in UDS's claims. *See Railan v. Katyal,* 766 A.2d 998, 1009 (D.C.2001). In recommending the selection of D & K, the agency and the Selection Committee properly took into consideration and applied (1) D.C.Code § 10–801(a) which, in part, "authorize[s] and empower[s] [the Mayor], in his discretion, for the best interests of the District of Columbia ..., and with the approval of the Council by resolution, to sell ..., or otherwise dispose of real property"; (2) § 10–801(b–1)(B) which requires the Mayor to provide an analysis which includes "[t]he manner in which economic factors were weighted and evaluated, including estimates of the monetary benefits and costs to the District that will result from the disposition"; and (3) § 10–801(f) which commands "the Mayor to take any steps necessary to ensure continuous community input in the disposition of any real property to be disposed of."

■■■■ UDS's proof of the District's alleged bad faith in conducting the selection process falls far short of the "almost irrefragable proof," amounting to "clear and convincing evidence" required to establish "bad faith" on the part of the District, *Galen Med. Assocs., Inc., supra,* 369 F.3d at 1330; *Organization for Envtl. Growth, supra,* 700 A.2d at 201, and UDS's record proof does not reflect "evidence of some specific intent [on the part of the District] to injure [UDS]," *Kalvar Corp., Inc. v. United States,* 211 Ct.Cl. 192, 543 F.2d 1298, 1302 (1976); *District of Columbia v. Kora & Williams Corp.,* 743 A.2d 682, 695 (D.C.1999). Nor is there any concrete, credible evidence of a conspiracy on the part of the District's officials. "Civil conspiracy depends on performance of some underlying tortious act"; thus, it is "not independently actionable...." *Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.,* 749 A.2d 724, 738 (D.C.2000) (internal quotation marks and citations omitted). Evidence of an underlying tortious act is lacking in this record. Furthermore, there is no evidence that UDS had a vested property right to develop the property, or a vested right to the highest score on its proposal because it was the most qualified bidder. *Cf. Dambrava v. Office of Pers. Mgmt.,* 466 F.3d 1061, 1063 (Fed.Cir.2006). The right to develop the

Petworth site did not belong to UDS, and there is no concrete, credible evidence that D & K was unjustly enriched because D & K "retain[ed] a benefit [the right to develop the Petworth site] which in justice and equity belong[ed] to [UDS]," *Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.*, 870 A.2d 58, 63 (D.C.2005) (quoting *4934, Inc. v. District of Columbia Dep't of Employment Servs.*, 605 A.2d 50, 55–56 (D.C.1992)). In addition, it is insufficient to list countless numbers of allegedly material facts in dispute when there is only "some metaphysical doubt" about them and where the record lacks "evidence on which the jury could reasonably find for the [non-moving party]." *LaPrade, supra,* 882 A.2d at 196 (citation omitted).

We illustrate the conclusory, non-concrete and non-credible nature of the proof offered by UDS. Norman F. Beeke, the Managing Member of UDS, appeared to be its main witness; he provided a deposition and two declarations. In his deposition he was asked who manipulated the selection process so that D & K would be selected, as alleged by UDS. He responded, in part: "Well, circumstantial evidence seems to indicate to us that you'd be looking at members of the Deputy Mayor's Office, Planning and Economic Development, and that could be anywhere from Steve Green to Eric Price to Des Bracey to Michael Jasso." When asked what deliberate manipulative acts Steve Green took to steer the award to D & K, Mr. Beeke replied:

> Well, we know from Des Bracey's testimony that his office was next to Steve Green, and we know that Steve Green is close to the Mayor. We've established that. And I think that the evidence—I wouldn't call it necessarily evidence but the circumstantial evidence that we have would be that it's entirely possible that Mr. Green, at the behest of the Mayor, asked Mr. Bracey to do certain things in relationship to this award.

Mr. Beeke asserted that the recommendations Des Bracey made to Deputy Mayor Price "were in large part erroneous," apparently because "a number of the evaluation criteria were different in the final scoring matrix than what was listed in the evaluation criteria in the RFP," and D & K "was allowed—was asked, not simply was allowed to but was asked to modify their submission to move from 100 percent rentals to 100 percent for sale housing." Our review of the record does not support these statements. Both the original and modified scoring followed the criteria outlined in the RFP. Furthermore, D & K's original proposal specified that it had the flexibility to sell rather than to rent the housing units; and the District's post-submission question about ownership merely sought to confirm that stated flexibility.

In response to the question, what did Mr. Jasso do "to deliberately manipulate the award to [D & K]," Mr. Beeke replied, in part, he "was one of the evaluators, and he scored the evaluation sheet[,] and his score certainly ... contributed to that award." Mr. Beeke did not know why Mr. Jasso would have steered the award to D & K. In one of his declarations, Mr. Beeke addressed UDS's responsiveness, but not that of D & K. In his other declaration, he complained about the bidders' presentations to the community meeting and the allegedly more favorable treatment that D & K received, and he criticized the scoring of the proposals, especially with respect to UDS's proposed tax abatement or subsidy. But the record shows that each bidder had an opportunity to make presentations to the community, and we discern nothing in the record that prevented UDS from listening to the community presentation of D & K. A declaration from James L. Prost, an economic analyst for UDS, interpreted the RFP as

requesting a "present value evaluation of the proceeds resulting from a land sale or ground lease of the site." He concluded that "the published criteria would require a net present value analysis applying the same time frame to each respondent, adjusting land lease or sales proceeds for any subsidy and utilizing an identical discount rate," but his firm "did not find this process utilized by the District." He included his own net present value analysis in another declaration, which favored PIP ($1.6 million compared with $1.1 million for D & K). However, the RFP clearly reflected concern about the need for a District subsidy, such as the tax abatement contained in UDS's proposal. The RFP specifically stated: "The proposing team's financial offer for either sale or ground lease will be evaluated in Present Value terms. Dependence on public subsidy will be included in the evaluation." Members of the Selection Committee found UDS's response to their request for clarification about the subsidy to be "ambiguous." In addition, D.C.Code § 10–801(b–1)(B) required the Mayor to take into consideration "the monetary benefits and costs to the District that will result from the disposition" of District property. Moreover, "[c]ontracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." *Savantage Fin. Servs., Inc., supra,* 595 F.3d at 1286.

Furthermore, the depositions of District officials and a consultant—Mr. Price, Mr. Bracey, and Ms. Morrison—and declarations by Mr. Jasso and Mr. Bracey—offered concrete evidence regarding the design of the RFP, the review of the original proposals by Ms. Morrison and the Ehrenkrantz firm, the impartial process of seeking answers to post-submission questions, and the integrity of the scoring and selection processes. Most telling and persuasive, perhaps, is the memorandum from

Mr. Bracey to Mr. Price presenting and justifying the recommended selection of D & K to develop the Petworth site.

■ Under our standard of review of a bid protest case, we will invalidate the agency action, based upon our review of the agency record, if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Savantage Fin. Servs., supra,* at 1285 (citations omitted). We examine whether "either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Galen Med. Assocs., Inc., supra,* 369 F.3d at 1329 (citations omitted). "Thus, when reviewing a judgment in a bid protest case, our task is to address independently any legal issues, such as the correct interpretation of a solicitation, and then to determine whether there are any genuine issues of material fact as to whether the agency decision lacked a rational basis or involved a prejudicial violation of applicable statutes or regulations." *Id.* (internal quotation marks and citation omitted). In reviewing the record, we are mindful that "the relative merit of competing proposals is primarily a matter of administrative discretion." *Id.* at 1330 (citation omitted). Our independent, *de novo* review of the record, as detailed above, satisfies us that the District not only properly interpreted the RFP, but also conducted the selection process fairly and in good faith in accordance with D.C.Code § 10–801 and the Council Resolution. We discern no genuine issue of material fact on this record. Moreover, "the evidence and its attendant inferences, viewed in the light most favorable to the non-moving party [UDS], support but one reasonable conclusion favorable to the moving party [the District]," and that is that the District is entitled to judgment as a matter of law. *DiSalvo,* 974 A.2d at 870 (internal quota-

tion marks and citation omitted). In the final analysis we are satisfied that the selection of D & K is grounded in a rational basis and comports with the statutory standard of the Mayor's exercise of "discretion, for the best interests of the District of Columbia." D.C.Code § 10–801(a).

Accordingly, for the foregoing reasons, we affirm the trial court's dismissal of D & K's remaining claims, but on the ground that the District is entitled to judgment as a matter of law.

*So ordered.*