*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CV-1002

MORPHOTRUST USA, INC., APPELLANT,

V.

DISTRICT OF COLUMBIA CONTRACT APPEALS BOARD, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(12-CAP-9430)

(Hon. Brian F. Holeman, Trial Judge)

(Argued October 23, 2014                Decided May 28, 2015)

*Jessica Ring Amunson*, with whom *Daniel E. Chudd* and *Damien C. Specht* were on the brief, for appellant.

*James C. McKay, Jr.*, Senior Assistant Attorney General, with whom *Irvin B. Nathan*, Attorney General for the District of Columbia at the time the brief was filed, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY and EASTERLY, *Associate Judges*, and FARRELL, *Senior Judge*.

Opinion for the court by *Associate Judge* EASTERLY.

Concurring opinion by *Senior Judge* FARRELL at page 38.

Dissenting opinion by *Associate Judge* BLACKBURNE-RIGSBY at page 39.

EASTERLY, *Associate Judge*: This case requires us to interpret the Procurement Practices Reform Act of 2010 (the "PPRA"), D.C. Code § 2-351.01 *et seq.*, legislation which the Council of the District of Columbia passed to promote competition, fairness, and public confidence in the District government's contracting process. Specifically, we consider the work an agency must do before including limiting specifications in a request for proposals ("RFP") and, relatedly, the role that the statutorily created Contract Appeals Board ("Board") must play in reviewing pre-award protests to RFPs to ensure that limiting specifications are justified under the PPRA and corresponding regulations.

The RFP in question sought proposals for a contract to produce driver's licenses for issuance by the District of Columbia's Department of Motor Vehicles ("DMV"). MorphoTrust USA, Inc. ("MorphoTrust") filed a protest with the Board, asserting that a number of the specifications in the RFP were overly restrictive and needlessly chilled competition. After the Board denied the protest and the Superior Court affirmed the Board, MorphoTrust filed this appeal. MorphoTrust argues that the Board improperly deferred to the judgments of the DMV regarding the challenged specifications, failed to resolve important disputed facts, and made findings that were unsupported by the record.

We agree that the Board's review of MorphoTrust's protest to the DMV's RFP was inadequate, and neither complied with the PPRA's text and its corresponding regulations nor fulfilled their goals. Particularly at the initial stage of the procurement process, when the issue is who will be eligible even to submit a proposal, the Board may not defer broadly to agency decision-making. Rather, the Board has a duty to assess "de novo"—the statutory term—whether challenged specifications that limit competition only do so because they reflect the District's stated minimum needs. We question whether the information currently in the record would have permitted the Board to make such a de novo determination, but the point is that this determination is the Board's to make in the first instance. Accordingly, we reverse the order of the Superior Court and remand for proceedings not inconsistent with this opinion.

## I. Overview of the Relevant Procurement Law and Regulations

The procurement of goods and services by the District of Columbia government is generally governed by the PPRA and corresponding regulations.[1]

---

[1] *See* 27 DCMR § 100 *et seq*. Notably, the bulk of these regulations were promulgated in connection with the D.C. Procurement Practices Act of 1985 ("the PPA"), which was repealed when the PPRA became law. The PPRA provides,

(continued…)

Among the Act's central purposes are "foster[ing] effective and equitably broad-based competition in the District," "obtain[ing] full and open competition by providing that contractors are given adequate opportunities to bid," and "increas[ing] public confidence in the procedures followed in public procurement."[2] The Act itself provides that it shall be "liberally construed and applied to promote its underlying purposes and policies."[3]

One means by which a District agency may procure goods and services under the PPRA is through a request for "competitive sealed proposals," which are solicited by the Office of Contracting and Procurement on the agency's behalf.[4]

---

(…continued)
however, that "existing procurement rules, to the degree they are consistent with this chapter, shall remain in effect until they are superseded by rules issued in accordance with subsection (a) of this section" which authorizes the Chief Procurement Officer "to issue rules." D.C. Code § 2-361.06 (b) (2012 Repl.). Both the Board and the Office of Contracting and Procurement identify these regulations on their respective websites as the regulations currently in force. The District has never argued that these regulations are defunct and instead has relied on these regulations throughout this litigation; we will do the same.

[2] D.C. Code § 2-351.01 (b)(2), (3), (5) (2012 Repl.).

[3] D.C. Code § 2-351.01 (a).

[4] *See* D.C. Code § 2-354.03 (2012 Repl.). The agency itself develops the RFP's contents, including a "statement of work or other description of the District's specific needs"; the Office of Contracting and Procurement then publicizes the RFP and receives the proposals. *Id.* at § 2-354.03 (d), (e).

Consistent with the statute's general focus on fostering competition, such proposals must be "solicited from the maximum number of qualified sources."[5]

The District's procurement regulations specify steps that agencies must take to ensure "full and open competition"[6] from the outset of the solicitation. An agency with a need for a particular good or service must first, before it actually drafts an RFP, "perform procurement planning and conduct market surveys,"[7] gathering information about the "entire available market."[8] The agency must then use this market research to "develop [the] specifications and purchase descriptions" to be included in the RFP, "in a manner designed to promote competition to the maximum extent possible, with due regard to the nature of the

---

[5] D.C. Code § 2-354.03 (b) (2012 Repl.); 27 DCMR § 1600.1, -.2 (2013). *See* 27 DCMR § 2500.1 (1988) ("The District shall specify procurement needs in a manner designed to promote competition to the maximum extent possible.").

[6] 27 DCMR § 1009.1 (2011).

[7] *Id.*; *see id.* at § 1009.4 ("Procurement planning shall begin as soon as an agency need is identified and preferably well in advance of the fiscal year in which the contract award is necessary.").

[8] 27 DCMR § 2599.1 (1988) (defining "market research" as "the process used for collecting and analyzing information about the entire available market that will satisfy the minimum agency need[,] used to arrive at the most suitable approach for acquiring, distributing, and supporting goods and services").

goods or services to be procured."[9] Any specifications that the agency ultimately decides to include in its RFP "shall state only the District's actual minimum needs,"[10] must "reflect . . . the market available to meet those needs,"[11] and may include "restrictive provisions and conditions only to the extent necessary to satisfy the minimum needs of the District, or as authorized or required by law."[12]

If a prospective offeror believes that an agency has failed to adhere to the above-described statutory and regulatory provisions promoting competition, and wishes to challenge the specifications of an RFP as unduly restrictive, the PPRA directs the offeror to seek relief from the Contract Appeals Board.[13] The Board is an independent, neutral, executive-branch entity, comprised of administrative law

---

[9]  27 DCMR § 2500.2 (1988) ("The District shall develop specifications and purchase descriptions using market research in a manner designed to promote competition to the maximum extent possible, with due regard to the nature of the goods or services to be procured."); *see supra* note 8.

[10]  27 DCMR § 2500.4.

[11]  *Id.* at § 2500.5.

[12]  *Id.* at § 2500.3.

[13]  *See* D.C. Code § 2-360.03 (a) (2012 Repl.) (designating the Board as the "exclusive hearing tribunal for . . . [a]ny protest of a solicitation"); 27 DCMR § 3800.1 (2012) ("[A]ll protests shall be filed with the District of Columbia Contract Appeals Board in accordance with the CAB's rules. The CAB has original jurisdiction to decide all protests of solicitations or awards.").

judges who are licensed attorneys with, *inter alia*, "no less than 5 years experience in public contract law."[14]

The PPRA authorizes the Board, after hearing from both the protestor and the District,[15] to resolve disputed issues of fact.[16] The PPRA also directs that "the Board shall decide whether the solicitation . . . was in accordance with the applicable law, rules, and terms and conditions of the solicitation."[17] The statute provides that the Board's review "shall be de novo," and "[a]ny prior determinations by administrative officials shall not be final or conclusive."[18] If the

---

[14] D.C. Code §§ 2-360.01 (a)(2); -360.02 (2012 Repl.).

[15] After a protest is submitted to the Board, the agency must submit a report which includes the agency's "position and defense for each ground of the protest, including facts, legal principles, and precedents supporting its position." 27 DCMR § 305.1 (e) (2002).

[16] *See* D.C. Code § 2-360.08 (e) (2012 Repl.) ("A determination of an issue of fact by the Board under subsection (d) of this section shall be final and conclusive unless arbitrary, capricious, fraudulent, or clearly erroneous."). *See also* 27 DCMR § 120.1 (2002) (specifying that "[e]xcept as otherwise provided by law, the burden of persuasion by a party to establish a fact or facts in dispute shall be met by a preponderance of the evidence"); 27 DCMR § 307.4 (2002) (discussing when the Board may treat facts as conceded); 27 DCMR § 311.1 (2002) ("If the Board determines that there is a genuine issue of material fact which cannot be resolved on the written record, the Board may order an evidentiary hearing.").

[17] D.C. Code § 2-360.08 (d).

[18] *Id.*; *see* D.C. Code § 2-360.03 (a) ("The Board shall be the exclusive hearing tribunal for, and shall review and determine de novo . . . [a]ny protest of a

(continued…)

Board sustains the protest, it has broad remedial power, including the power to order the District to terminate any contract awarded under the challenged solicitation and to issue a new RFP.[19]

## II. Facts and Procedural History

In 2012, the Office of Contracting and Procurement issued an RFP on behalf of the DMV, RFP No. Doc62682, for a "Centralized Security Credentialing System" to produce driver's licenses and ID cards equipped with "the most secure credentialing features." In order to "improve and increase card security to deter fraud and deter attempts to illegally duplicate identity credentials," the RFP called for the system to "use the latest technology" and to manufacture cards that would "be tamper proof to the highest extent possible."

---

(…continued)
solicitation."); 27 DCMR § 101.7 (2002) ("The Board shall hear and decide, de novo, all cases under its jurisdiction.").

[19] D.C. Code § 2-360.08 (f) (authorizing the Board, when it sustains a protest, to terminate any contract awarded under the solicitation or to grant any "other relief" as it deems appropriate); 27 DCMR § 314.1 (d) (2002) (listing remedies available to the Board, including ordering the contracting agency to "[i]ssue a new solicitation").

The RFP set forth numerous specifications. Particularly with respect to the driver's licenses that would be manufactured under the contract, the RFP listed seventeen particular features that would, "at minimum," be required, including a solid polycarbonate card base and four laser-engraved details.[20] In addition, the RFP listed particular security requirements for the facility where the cards would be manufactured, among them "outside security to include fences, distance from entrance to parking[,] etc." The District made clear that these specifications were nonnegotiable.[21]

Before a contract was awarded, MorphoTrust filed a formal protest with the Board, challenging the specifications of a solid polycarbonate card base, the four laser-engraved details, and outdoor fencing.[22] MorphoTrust produces driver's

---

[20] The laser-engraved features required by the RFP were: (1) a primary photo, (2) a clear tactile feature, (3) a tactile data feature, and (4) a ghost window with image.

[21] After the Office of Contracting and Procurement issued the RFP, the District responded to questions from potential offerors and made some minor amendments to the RFP based on those questions. Among these questions, the District was asked whether it would consider proposals that did not comply with one or more of the specifications, and, specifically, whether it would "consider and award on a proposal of a non-polycarbonate card construction." The District responded that "[o]fferors are welcome to provide other options. However, the District will only evaluate the primary (required) proposal."

[22] MorphoTrust also asserted that the RFP was improperly tailored to reflect the specifications of a card produced for the Commonwealth of Virginia by a

(continued…)

licenses and ID cards for 41 states and, prior to this litigation, the District of Columbia. MorphoTrust's ID cards, however, are made from Teslin, as opposed to polycarbonate, and they are not laser-engraved.[23] MorphoTrust's production facility is also not secured by outdoor fencing. MorphoTrust asserted that the challenged specifications in the RFP far exceeded the "actual minimum needs of the District" for secure digitized driver's licenses and facility security, and that they were therefore unduly restrictive, improperly narrowed competition, and violated the District's procurement regulations. MorphoTrust further claimed its Teslin cards were just as durable and tamper-proof as laser-engraved cards made from polycarbonate, and its production facilities had security comparable (if not superior) to outdoor fencing. MorphoTrust asked the Board to recommend that the District amend the RFP and eliminate these requirements.

In response to MorphoTrust's protest, the District filed an Agency Report, defending the contents of the RFP. Repeatedly asserting without explanation the District's "singular security needs" as the nation's capital, the District argued that

---

(…continued)
competitor company, CBN-STI, and was likely to result in a sole-source procurement. MorphoTrust has not pursued this claim on appeal.

[23] Laser engraving is only possible on a polycarbonate card base.

the "DMV [had] established a minimum need for the most secure credentials possible."

The District preliminarily claimed that "DMV experts" had "engaged in an extensive three-year market study to develop specifications that met the need." To support this latter assertion, the District cited to a single-page declaration submitted by DMV's Chief Information Officer, Mr. Amit Vora. Mr. Vora's declaration in turn adopted as "accurate" a four-page, undated, anonymous "summary of steps taken by the Department of Motor Vehicles to Develop Secure Credentialing RFP" ("summary attachment").

The undated, anonymous summary attachment briefly addressed the actions taken by the DMV prior to issuing the RFP. It stated that unidentified individuals at unidentified times had "[a]ttend[ed] [c]onferences and research[ed] new technology and trends surrounding secure identification cards," but did not state what the DMV had learned. The summary stated that "DMV also gathered information by visiting and contacting the Department of Motor Vehicles in other jurisdictions," but likewise failed to detail any information the DMV had

acquired.[24]  The summary also listed "[r]ecent network opportunities that the Director of DMV and DMV's Driver's Services have attended for the past three years," but it did not identify with whom the DMV had "networked"; nor did it explain how these efforts related to its ultimate decision to include the challenged specifications in the RFP.

This was the "market research" on which the District relied in the Agency Report when it asserted that the "DMV [had] justified the minimum need for a polycarbonate card."[25]  Specifically, the District claimed that "[i]n the Declaration of Amit Vora, DMV set forth the reasons why no other material has the security of polycarbonate."  In fact, the Vora Declaration said nothing about the minimum need for a polycarbonate card and the District's citation was to the summary

---

[24]  Indeed, there was some indication that the DMV had been unable to provide more detail, given its explanation that "many of our network and research opportunities for a more secure credential occurred several years ago as we have been planning for some time now to implement a new secured credential."  The DMV identified only "some of the states/territories we visited," which included "AL, DE, MD, NY, VA, WVA, [and] Ottawa, CN.'"  The District did not submit to the Board any notes, records, or memoranda documenting these visits.

[25]  The District made no argument in the Agency Report in support of the four laser-engraved features challenged by MorphoTrust; it simply noted that laser-engraving was a concomitant feature of a polycarbonate card.  The summary attachment to the Vora Declaration similarly noted that laser-engraving can only be done on polycarbonate cards and asserted that a "laser-engraved ghost window is a security feature that cannot be duplicated."

attachment to the Vora Declaration. The summary attachment in turn did not explain why "no other material" would suffice. It contained no mention of potential alternatives to polycarbonate. It simply provided a description of the features of polycarbonate cards, repeating almost verbatim—but without attribution—portions of a 2008 marketing brochure of a polycarbonate manufacturer, Gemalto.[26] The summary attachment and the Agency report specifically touted the fact that polycarbonate cards are non-delaminable (i.e., the layers of the card are fused together and cannot be peeled apart), and thus tamper-proof, and that the card "has over a ten year durability."

The District also asserted that the DMV had "justified the minimum need for additional facility security." The District asserted that, given the sensitivity of the information gathered from individuals seeking identification, the offeror needed to have a production facility "at least as secure as the District's own DMV facilities." The District did not detail DMV's security features, but it asserted that they met the "standards of the American Society of Industrial Security ('ASIS')." The

---

[26] The District attached this brochure (entitled a "white paper" on "Polycarbonate and Identity Documents") as an exhibit to the Agency Report even though neither Mr. Vora, nor anyone else from the DMV, acknowledged reviewing it prior to drafting the specifications of the RFP, much less relying on it in doing so.

District claimed that the security specifications were likewise prepared in accordance with ASIS standards, but it supplied no supporting documentation for this assertion, not even the standards themselves. The District did, however, list in the Agency Report a number of the standards it represented as ASIS standards; none of these mentioned fencing.[27]

Following submission of the Agency Report, MorphoTrust filed Comments on the Agency Report in which it observed that the District had failed to provide a credible justification for the challenged specifications. Asserting that the District had "confused" its minimum needs with "design preferences," MorphoTrust argued that the District had failed to rebut MorphoTrust's evidence that its cards and production facility would fully satisfy the District's security needs at a better price. More particularly, MorphoTrust argued that it had presented evidence that there was "no consensus among the states on whether polycarbonate or another material are more secure or durable," and it argued that certain features of a polycarbonate card, including laser-engraving (which the Agency Report made no

---

[27] The same list (again with no mention of fencing) appears in the summary attachment to Mr. Vora's Declaration, but there the list is identified as security "features [that] are currently in place at all DMV facilities," not as ASIS security standards. The District did not attach any additional evidence of the DMV facilities' security features.

attempt to defend as a specification), "do not automatically make it a more secure card."[28] On the issue of the use of fencing to ensure security of an offeror's production facility, MorphoTrust similarly argued that the fencing requirement was not compelled by any industry standards that the District purported to follow and that the District had not shown that its DMV facilities were protected by fencing, even as it had claimed that it needed the offeror's facility to be as secure as DMV facilities.

In response, the District moved for and received leave to file a Reply along with additional exhibits. The exhibits were submitted to buttress the District's selection of polycarbonate as the material from which an offeror must make

---

[28] For example, MorphoTrust argued that the fact that a polycarbonate card is non-delaminable was immaterial because efforts to separate the layers of a Teslin card would be "readily discernable," making it equally tamper proof. MorphoTrust also proffered evidence that its Teslin cards were highly durable.

MorphoTrust further noted that Teslin cards had other security features that polycarbonate cards did not—among them, the ability to reproduce more life-like color photographs, which is not currently possible with laser engraving. On the subject of laser engraving, MorphoTrust, citing attached exhibits, argued that laser engraved ghost windows could be counterfeited and laser engraved clear tactile features were no better than dark tactile features (which need not be laser engraved).

Ultimately, MorphoTrust argued that what was important was "layering and integrating of a variety of security features on and within the ID card," rather than "adherence to one or a few specific security factors."

identification cards,[29] but the District made no representation that anyone had consulted these documents or was aware of the information contained therein prior to the issuance of the RFP. The Reply, like the Agency Report, did not separately defend the four laser-engraved details and did not respond to MorphoTrust's challenge to the agency's fencing requirement.

In a brief order that was long on background facts and recitation of the parties' arguments, and short on analysis of the merits, the Board denied MorphoTrust's protest. It preliminarily accepted without question the District's assertion that it had undertaken three years of market research before selecting the specifications for the manufacture of the identification card. Then, without any acknowledgement of disputes of fact, much less any fact-finding, the Board "deferred" to the District's assessment that the challenged specifications reflected its minimum needs. The Board thus concluded that MorphoTrust had failed to

---

[29] These documents consisted of: another "white paper," authored by Jan Kremer & Associates, a security consulting firm which MorphoTrust alleged had ties to Gemalto; a document indicating that the European Union had selected polycarbonate for its identification cards; and a 2010 Government Accountability Office report criticizing the State Department for declining to follow a recommendation to use polycarbonate as the base for its passport cards without first performing a full assessment of polycarbonate's benefits.

carry what the Board understood to be the challenger's "heavy burden" to show that the challenged specifications were "unreasonable."

MorphoTrust unsuccessfully sought to overturn the Board's decision in the Superior Court of the District of Columbia, arguing that the Board had employed the wrong standard of review and substantive standard in evaluating its protest, that the Board's decision lacked substantial support in the agency record, and that the decision was clearly erroneous as a matter of law. This appeal followed.

## III. This Court's Jurisdiction and Standard of Review

Before we identify our standard of review, we must first clarify our jurisdiction.[30] This case comes to us from the Superior Court, where MorphoTrust sought review of the Board's decision denying its pre-award protest of the DMV's

---

[30] Although neither party has raised a jurisdictional challenge, this court has an independent obligation to consider the source of our jurisdiction where it is subject to question. *See Nunnally v. District of Columbia Metro. Police Dep't*, 80 A.3d 1004, 1006 n.4 (D.C. 2013) (citing *Murphy v. McCloud*, 650 A.2d 202, 203 n.4 (D.C. 1994)).

RFP.[31]  We have jurisdiction to review a Superior Court order only so long as the Superior Court had jurisdiction to issue it.[32]

Nothing in the PPRA directed MorphoTrust to proceed first to Superior Court, but our cases interpreting the predecessor procurement statute and its regulations have required protesting parties to seek relief in the first instance in Superior Court.  *See, e.g.*, *Abadie v. District of Columbia Contract Appeals Bd.*, 916 A.2d 913, 918 (D.C. 2007); *Jones & Artis Const. Co. v. District of Columbia Contract Appeals Bd.*, 549 A.2d 315, 317-18 (D.C. 1988).  Reviewing the predecessor statute in *Jones & Artis*, we concluded that protests were not "contested cases" within the meaning of the D.C. Administrative Procedure Act ("DCAPA") and therefore were properly routed through Superior Court before we could review them.  *See Jones & Artis*, 549 A.2d at 317-18.  Our analysis turned on both the absence of statutory language indicating that protest proceedings required a hearing,[33] as well as the failure of the Board to adopt any "regulations

---

[31]  Indicating some confusion about the proper route for seeking appellate relief, MorphoTrust initially appealed directly to this court, but voluntarily dismissed its appeal upon "learning" that it was required to first make its case to Superior Court.

[32]  *Nunnally*, 80 A.3d at 1006-10.

[33]  Although the predecessor statute did not require a hearing to resolve a protest, it designated the Board as a "hearing tribunal for . . . any protest of a

(continued…)

whatsoever . . . that would suggest the Board might use a trial-type hearing to resolve a protest." *Id.* at 317. We distinguished the absence of such provisions for "protests" from the provisions addressing contractor appeals, which provided for "hearings," "oaths, discovery, and subpoena power." *See id.*

In 2002, however, the Board enacted regulations that allow it to use a trial-type hearing to resolve a protest.[34] Following the analysis of *Jones & Artis*, one might conclude that bid protests litigated pursuant to these regulations are, in fact, "contested cases." Nevertheless, this court has continued to hold that protests are not contested within the meaning of DCAPA. *See Abadie*, 916 A.2d at 918 (citing

_____

(…continued)

solicitation." D.C. Code § 1-1189.8 (1988) (repealed 2010). The PPRA contains the same "protest of a solicitation" language. D.C. Code § 2-360.08 (a).

[34] *See* 27 DCMR § 311.1, -311.2 (permitting the Board to use an "evidentiary hearing," including taking "testimony under oath" and "direct and cross-examination of witnesses," to resolve "genuine issue[s] of material fact" that arise during a protest). At the same time, the Board promulgated regulations which "govern all proceedings in all cases," including protests, *see* 27 DCMR § 100, and which envision trial-type proceedings. *See, e.g.*, 27 DCMR § 110.7 (2002) (permitting the Board to order a hearing on a motion); 27 DCMR § 114 (2002) (authorizing the presiding judge to issue subpoenas to compel witnesses to appear at a hearing to testify); 27 DCMR § 112 (2002) ("Discovery"). These regulations additionally direct the parties to seek judicial review of the Board's decision on a protest in Superior Court. 27 DCMR § 312.2 (2002). We do not consider § 312.2 dispositive of the jurisdictional question, however, because nothing in the PPRA authorizes the Office of Contracting and Procurement or the Board to override DCAPA's contested-case review in the event this court determines that protests are contested cases.

*Jones & Artis*). *See also Eagle Maint. Servs., Inc. v. District of Columbia Contract Appeals Bd.*, 893 A.2d 569, 572 n.1 (D.C. 2006). As we see no means of distinguishing this prior precedent,[35] we conclude it was proper for MorphoTrust to petition the Superior Court for review before appealing to this court.

We review the "Superior Court's affirmance of the [Board's] decision in the same manner as if the ruling came to us directly from the agency." *Abadie*, 916 A.2d at 918 (internal quotation marks omitted). "In other words, 'it is the decision of the [Board] that this court reviews.'" *Id.* at 918 (quoting *Eagle Maint. Servs.*, 893 A.2d at 572 n.1). In so doing, we accept the Board's decisions on questions of fact as "final and conclusive" unless they are "arbitrary, capricious, fraudulent, or clearly erroneous." D.C. Code § 2-360.08 (e).[36] We review questions of law de novo, however, and our de novo review encompasses issues of statutory construction, on which "the judiciary is the final authority." *Abadie v. District of*

---

[35] *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971) (no division of this court will overrule a prior decision of this court).

[36] Both the District and MorphoTrust cited D.C. Code § 2-360.07 (2012 Repl.) to explain the standard of review this court should apply. By its terms, however, § 2-360.07 applies to appeals by contractors (i.e. persons who have already entered into a contract with the District, *see* D.C. Code § 2-351.04 (17) (2012 Repl.)) who come directly to this court, pursuant to D.C. Code § 2-360.05 (2012 Repl.) ("Appeal of Board Decisions"). Section 2-360.07 (2012 Repl.) has no application to pre-solicitation protests like this one, which are governed by § 2-360.08 ("Protest procedures").

*Columbia Contract Appeals Bd.*, 843 A.2d 738, 741 (D.C. 2004). *See also Abadie*, 916 A.2d at 919; *Eagle Maint. Servs.*, 893 A.2d at 576.[37]

## IV.    Analysis

MorphoTrust argues that the Board erred as a matter of law in reviewing its pre-award protest by deferring to the DMV's decisions in drafting the RFP and considering only whether the limiting specifications therein were "reasonably related" to the District's minimum needs.  We agree that the Board appeared to misunderstand its role as defined by the PPRA and corresponding regulations, and thus failed to review MorphoTrust's protest with the requisite rigor.

---

[37]  This court's decision in *Urban Development Solutions, LLC v. District of Columbia*, 992 A.2d 1255, 1266-67 (D.C. 2010), does not compel more deferential review of the Board's actions, as the District argues.  *Urban Development Solutions* did not present an issue of statutory construction.  Instead, the central issue in the case was whether the plaintiff had adduced sufficient evidence to substantiate its claims that the District had acted improperly in a bid selection process regarding surplus property (which is not overseen by the Board in any event, *id.* at 1259 n.3).  *Urban Development Solutions* thus in no way undermines the proposition that, *vis a vis* all District agencies, this court is "presumed to have the greater expertise when an agency's decision rests on a question of law and . . . therefore remain[s] 'the final authority on issues of statutory construction.'" *E.C. v. RCM of Wash., Inc.*, 92 A.3d 305, 313 (D.C. 2014).

## A. Clarifying the Board's Function

We turn first to the standard of review that the Board is to employ in its analysis of pre-award protests. Relying exclusively on its own common law, i.e., a body of its own decisions dating back to the 1980s, the Board stated that it would "defer" to the agency's determination of its needs and of the best methods of accommodating them, and assess only whether challenged specifications were "reasonably related to achieving the government's actual minimum needs," imposing on the protestor the "heavy burden" to prove otherwise. The Board's understanding of its standard of review as requiring broad deference in assessing reasonableness cannot be reconciled with its unambiguous statutory and regulatory obligations *vis a vis* protests of a solicitation or an award of a contract.

As discussed above, the PPRA identifies the promotion of competition as a central goal and confers upon the Board the ultimate authority and responsibility to "decide whether [a challenged] solicitation . . . was in accordance with the applicable law."[38] More to the point, the statute explicitly provides that the

---

[38] D.C. Code § 2-360.08 (d).

Board's review "shall be de novo."[39]  The corresponding regulations reiterate that "[t]he Board shall hear and decide, de novo, all cases under its jurisdiction."[40]

In legal parlance, "de novo" means "anew," and to conduct a "de novo judicial review" means to conduct "a nondeferential review" of a preceding decision.[41]  The PPRA's specification that the Board's review be "de novo" aligns perfectly with the PPRA's express directive that the Board's determinations are controlling and that "[a]ny prior determinations by administrative officials shall not be final or conclusive."[42]  Looking beyond the provisions that plainly spell out the Board's review obligations, we note that the PPRA establishes the Board as an entity outside and independent of the agency, comprised of a select group of

---

[39] *Id.  See* D.C. Code § 2-360.03 (a) ("The Board shall be the exclusive hearing tribunal for, and shall review and determine de novo . . . [a]ny protest of a solicitation."); 27 DCMR § 101.7 ("The Board shall hear and decide, de novo, all cases under its jurisdiction.").

[40] 27 DCMR § 101.7.

[41] BLACK'S LAW DICTIONARY 112 (10th ed. 2010).  By contrast, "deferential review" is defined as authorizing relief "only when [the] earlier proceeding entailed an unreasonable application of clearly established law or clearly unreasonable determination of the facts."  *Id.* (defining "deferential review").

[42] D.C. Code § 2-360.08 (d).

attorneys with expertise in procurement law.[43]  This institutional structure supports our conclusion that the Board exists to review agency decisions searchingly, not defer to them broadly unless they are deemed unreasonable.[44]

Unable to disregard the plain language of the PPRA and corresponding regulations, the District argues that the Board's "de novo" review relates only to its ability to receive "new" evidence and is still "consistent with according deference to" a procuring agency.  But this interpretation of "de novo," as broadly deferential, cannot be squared with the commonly understood definition of de novo review discussed above.  Nor are we persuaded by the District's argument that "de novo" must have special meaning in the procurement context because federal agencies like the Government Accountability Office ("GAO") and the General Services Agency Board of Contract Appeals ("GSBCA") have employed a deferential standard of review.  Where "District contracting practice parallels

_____

[43]  Among other things, the PPRA heightened the qualifications for Board members.  *See* D.C. Code § 360.02 (b); D.C. Council, Comm. on Gov't Operations & the Environ., Report on Bill 18-610 at 19 (Oct. 21, 2010).

[44]  The Board did state that it would "more closely scrutinize the agency's determination of its minimum needs," if a protestor could "show that the specifications will result in a sole source award."  But not only do we fail to see any support in the PPRA for this more limited scrutiny, the concern of the PPRA and its corresponding regulations is plainly to maximize competition, not simply to ensure that there are at least two offerors.

federal government contract law," this court has obtained guidance from "relevant decisions of federal tribunals with 'particular expertise in this area.'" *Abadie*, 916 A.2d at 919 (quoting *Dano Res. Recovery, Inc. v. District of Columbia*, 620 A.2d 1346, 1351 (D.C. 1993)). But regarding standards of review, the PPRA does not resemble the federal law under which the GAO operates, or the GSBCA used to operate, because the latter does not specify that the standard of review of agency decision-making is de novo.[45] In light of these differences, we adhere to the plain language of our own law.

---

[45] The GAO applies a different statutory scheme when it evaluates whether the terms of an RFP comply with the law: The federal statute and regulations do not specify the standard of review that the GAO must use, and, in any event, unlike the decisions of the Board, the GAO's recommendations are not binding. *See* 31 U.S.C. §§ 3552-54; 4 C.F.R. § 21.0 (2008); 4 C.F.R. § 21.9 (2005). *See also Kingdomware Tech., Inc. v. United States*, 754 F.3d 923, 929 (Fed. Cir. 2014) ("Although agencies often follow GAO recommendations in bid protest decisions . . . these recommendations are not binding on an agency.").

Like the GAO, the GSBCA (which ceased to exist in 2007) operated under a distinct statutory scheme that did not define its standard of review as de novo. *See* 40 U.S.C. § 759 (1988). Although at one point in time the GSBCA described its standard of review as de novo, *see e.g., Protest of Lanier Bus. Prods.,* GSBCA No. 7702-P, 985 WL 6487 (Apr. 2, 1985), it later endorsed review merely for "reasonableness." *See, e.g.*, Protest of Computer Sciences Corp., GSBCA No. 1497-P, 1991 WL 286233 (Dec. 30, 1991). Similarly, although the Federal Circuit referred to the GSBCA's standard of review as de novo in *Grumman Data Sys. Corp. v. Widnall*, 15 F.3d 1044, 1046 (Fed. Cir. 1994), it subsequently eschewed that standard and explained that the GSBCA's "task on review is to determine if an agency's procurement decision is grounded in reason. Once the Board determines that the agency's selection is so grounded, it then defers to the agency's decision." *Widnall v. B3H Corp.*, 75 F.3d 1577, 1579 (Fed. Cir. 1996).

(continued…)

Alternatively, the District argues that because the PPRA does not "unambiguously forbid" the Board from employing a deferential standard of review, this court should defer to the Board's "reasonable interpretation of the statute and rules it administers." As our discussion has shown, however, the PPRA and its corresponding regulations do not countenance the essentially hands-off deference to "reasonable" RFP specifications that the District urges, but instead require the Board's careful scrutiny of those terms for conformity to the agency's minimum procurement needs as shaped by the pro-competition bent of the statute. In accordance with the Supreme Court's decision in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), before we afford some deference to an agency's interpretation of the statute that it administers at least two conditions must be met: (1) the statutory language in question must be ambiguous, and (2) the agency's interpretation must be reasonable. *Id.* at 842-43; *Timus v. District of Columbia Dep't of Human Rights*, 633 A.2d 751, 758 (D.C. 1993) (en banc) (acknowledging the by now "familiar" two-part *Chevron* test and noting that

---

(…continued)

The dissent relies heavily on GAO and GSBCA precedent to support its argument that the Board should "defer" to "reasonable" agency decision-making in procurement decisions, notwithstanding the "de novo" review directive of the PPRA; but the dissent seemingly fails to appreciate that the GAO's and GSBCA's standard of review could be constructed (and altered) by those entities and the courts in the absence of an express statutory directive defining the standard of review, such as the standard contained in the PPRA.

"[t]his court employs the same analysis"). In our view, neither prerequisite has been satisfied in this case.[46]

---

[46] The dissent argues that it is "wholly unclear" what sort of review the Council of the District of Columbia intended the Board to exercise when it adopted a "de novo" review standard in the PPA and then reaffirmed that standard in the PPRA. Dissent at 45. But we see no reason to question the Council's understanding of this well-established term. "Where a legislature borrows terms of art in which are accumulated the legal tradition and meanings of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." *Dobyns v. United States*, 30 A.3d 155, 159-60 (D.C. 2011) (quoting *1618 Twenty-First St. Tenants' Ass'n, Inc. v. Phillips Collection*, 829 A.2d 201, 203 (D.C. 2003)) (internal quotation marks omitted).

Even if we were to agree that there were some measure of ambiguity in the term "de novo" review, we see no foundation for re-interpreting that term to mean the opposite of its dictionary definition. The dissent asserts that such a foundation lies in the Council's Report on the PPRA. Dissent at 46-47. But there is no discussion of the Board's standard of review in the Council's Report, nor is there anything that can fairly be interpreted to call into question the Council's intent to reaffirm that the Board must review agency procurement decisions "de novo," as that term is commonly understood. To the contrary, the Council Report notes at the outset that the impetus for the PPRA was the recognition that there were "significant flaws in the procurement system," flaws that were attributable not to particular deficits in the law then in place, the PPA, but rather to problems with its "implementation." D.C. Council, Comm. on Gov't Operations & the Environ., Report on Bill 18-610 at 3. The Council Report then elaborated that, according to a report by the 2006 Procurement and Contracting Reform Task Force,

> [T]en years of experience under the PPA have shown that agencies are not cooperating [with the law] and do not make effective, efficient procurement a priority. The authors found that a substantial portion of [District procurements are] known to be in violation of procurement procedures, indicating a lack of controls to insure compliance with the procurement laws and regulations. The experts concluded that the problems were not with the procurement law, but rather with the application of rules and the culture of compliance: [T]here are no

(continued…)

All of this is not to say that in exercising its review authority, the Board may give no recognition or weight to agency expertise reflected in an RFP's articulation of minimum needs. Bid solicitations may involve (to borrow Supreme Court language from another context) "factual dispute[s], the resolution of which implicates substantial agency expertise," sometimes "a high level of technical expertise," *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 376-77 (1989) (quoting in part *Kleppe v. Sierra Club*, 427 U.S. 87, 103 (1983)), and the Board need not turn a blind eye to such specialized knowledge embodied in particular RFP specifications. What remains indisputable, however, is the Board's obligation to conduct a searching and careful evaluation of both the process the agency has

---

(…continued)
> significant deficiencies in the District's procurement framework which would cause the procurement system, if its requirements were followed, to be dysfunctional. The critical problem . . . is the failure to establish a culture of compliance and enforcement of controls that insure compliance with the existing procurement regulation system.

*Id.* at 6-7 (internal quotations omitted). Among the recommendations made were "developing a more robust system of acquisition planning," increasing accessibility of procurement rules and regulations, and developing a more professional, better-trained workforce of procurement personnel. *Id.* at 7. *See also id.* at 8 (again noting the "failure to follow existing rules"); *id.* at 10 (discussing the need for more transparency and for "maintaining a written record of key decisions," and "accessible protest procedures to challenge potential violations of the law."). In light of these concerns and objectives, we are hardpressed to conclude that the Council intended "de novo review" to mean "deferential review." Rather, one could readily infer that the Council retained the de novo review standard from the PPA because, as that standard of review is generally understood, it advanced the stated goal of better implementation of the District's procurement law.

followed in determining minimum needs and the evidence proffered to support its judgment of what its needs are.

Having clarified the Board's standard of review, we turn to the intimately connected issue of the substantive standard that the Board must employ when assessing a pre-solicitation protest of specifications within an RFP. To determine, as it must, if a District agency is following the law,[47] the Board must examine whether the challenged specifications "state only the District's actual minimum needs"[48] and whether any "restrictive provisions" are "necessary to satisfy the minimum needs of the District."[49]

We presume that an agency has the best understanding of what it requires in the way of goods and services. But to ensure that an agency does not develop tunnel vision or worse, the PPRA requires that an agency draft RFPs with an eye to maximizing competition. This means that if an agency wants to include a limiting specification in an RFP, the agency must be able to justify this specification as a minimum need. The agency may do so with the fruits of its pre-solicitation market

---

[47] D.C. Code § 2-360.08 (d).

[48] 27 DCMR § 2500.4.

[49] *Id.* at § 2500.3.

research. It is the Board's essential function to ensure that the agency has done its homework. Where a desired specification is highly restrictive or narrowly drawn, the agency's market research must reflect some acknowledgement and actual comparison of the qualities of competing products as well as some sort of cost-benefit analysis. On the other hand, where a specification is set forth in more general terms, less detailed market research may be necessary to support its inclusion. There will be no formula for what level of record evidence is necessary to establish whether the RFP articulates the agency's minimum needs; but the Board's review in each case must reflect its duty to ensure that the RFP embodies the District's "actual minimum needs."[50] 27 DCMR § 2500.4.

---

[50] The dissent expresses concern that this court is conferring on the Board policy-making authority to define an agency's minimum needs. Dissent at 55-56. But we merely hold that when agencies identify their minimum needs, they must be able to justify them before the Board. The dissent also asserts that we must distinguish between what it sees as the Board's obligation to "vigorously" enforce the "procedural protections" of the PPRA, such as the market research requirement, and the Board's obligation to defer to an agency's ultimate assessment, in an RFP, of its minimum needs. Dissent at 68. The dissent does not endeavor to explain how the Board vigorously enforced the market research requirement in this case. But in any event, if, as the dissent seemingly posits, the Board were constrained to defer to an agency that "reasonably" disregarded the results of such research, these procedural protections would have little force or effect.

Here, the Board seemed to think that its obligation was only to undertake a free-floating "reasonableness" assessment of the challenged specifications, and that MorphoTrust, as protestor, bore the "heavy burden of demonstrating by a preponderance of the evidence that the agency has impermissibly narrowed competition," which, according to the Board "in other words" meant that the protestor had to show that the challenged restrictions were "unreasonable." These observations are part and parcel of the Board's erroneous understanding of its review authority as broadly deferential to the agency. Indeed, just as there is nothing in the PPRA that authorizes such self-abnegatory deference to the agency in resolving a pre-solicitation protest of an RFP, the PPRA and its corresponding regulations nowhere direct the Board merely to confirm that a challenged specification is not unreasonable.[51]

---

[51] We also take issue with the Board's explanation of the weight of the protestor's burden. (Its allocation on the protestor, although not addressed in the statute, appears proper; it is the norm in litigation generally that a plaintiff/challenger bears the burden to prove her case, and MorphoTrust concedes in its Reply that it bore the burden to prove that the DMV violated the PPRA by including the challenged limiting specifications.) The Board in this case correctly acknowledged that the protestor's burden was proof "by a preponderance" of the evidence. 27 DCMR § 120.1 (defining the "burden of proof" in all Board proceedings, and stating that "[e]xcept as otherwise provided by law, the burden of persuasion by a party to establish a fact or facts in dispute shall be met by a preponderance of the evidence"). But such a burden is not "heavy." *See In re E.D.R.*, 772 A.2d 1156, 1160 (D.C. 2001) (holding that preponderance of the evidence is merely that which "shows that the fact sought to be proved is more probable than not" (internal quotation marks omitted)).

We stress that we are clarifying the Board's reviewing authority (and responsibility) in the early stages of the procurement, when the agency is best positioned to structure an impending procurement either to promote or stifle competition. Although the Board's standard of review is at every stage de novo, as a procurement moves forward, more agency discretion is built into the process. For example, once a bid has opened, the Board may accept agency judgments incorporated into the initial solicitation because challenges to the contents of a solicitation are prohibited after bid opening.[52] Similarly, the fact that the Chief Procurement Officer (presumably with the input of the agency) may select the proposal that is "advantageous to the District" builds in some measure of discretion, particularly when technical expertise has come into play.[53] But at the outset of the procurement process, when the District seeks goods by means of "competitive sealed proposals," the Board must confirm, de novo, that challenged specifications reflect the District's minimum needs.

---

[52] *See* 27 DCMR § 302.2 (a) (2002)

[53] *See* D.C. Code § 2-354.03 (e), (g)(2); 27 DCMR § 1613.5 (2013) ("While the lowest price or lowest total cost . . . may be an important or even a deciding factor in most source selections, the District may select the source whose proposal is more advantageous to the District in terms of technical merit and other factors.").

**B. The Board's Resolution of MorphoTrust's Protest**

Having thus clarified the Board's role and reviewing obligations, we conclude that the Board's resolution of MorphoTrust's protest was inadequate.

*1. Card Specifications*

We first examine the Board's assessment of the challenged card specifications: That the card be made of polycarbonate and, relatedly, that it have at least four specific laser-engraved features. The Board stated that "the District is allowed to determine at the outset which security card features will best meet its minimum needs" and that the District "may specify certain required specifications as long as they are reasonable." As explained above, however, it was the Board's obligation to determine whether the challenged card specifications in fact reflected the District's minimum needs, even allowing for the specialized knowledge DMV may bring to bear on the issues.

The Board's first critical misstep was to conclude that the District had undertaken "the requisite market research to determine that this particular type of secure card" reflected the District's minimum needs. At least based on the

information provided by the District, the Board had no foundation for this determination. The record reflects little more than that, prior to drafting the RFP at issue, the DMV gathered some product information, i.e., it took some action to educate itself about polycarbonate cards and laser engraving, but even the details of this effort were murky. References were made to conferences attended, contacts made with other jurisdictions, and "networking," but zero detail was provided about what the DMV had learned. It is unclear when the DMV acquired the information about polycarbonate contained in the summary attachment, or when it came by the 2008 Gemalto marketing brochure or the Jan Kremer & Associates white paper, or whether it possessed any of this information when it drafted the RFP. But assuming it did, gathering product information is not the same thing as "market research." Market research requires an assessment of the "entire available market." *See supra* note 8 (citing 27 DCMR § 2599.1). In this case, one might reasonably expect market research to include materials from competitor producers of polycarbonate cards and non-polycarbonate cards, a survey of materials used by other states or government entities for their identification cards, a cost/benefit analysis of using different materials, or any other material that would support the conclusion that the DMV, selecting from a menu of known options, made an informed decision that it was necessary to manufacture the District's identification cards from polycarbonate as opposed to other materials.

Without true market research, the Board had no basis to evaluate, much less accept, the District's conclusory assertion (1) that polycarbonate cards with laser engraving are the "gold standard," or (2) even assuming such cards enjoy specific features superior to other materials (e.g., nondelaminability or durability), that these features should be controlling when others might also meet the District's minimal needs.[54] This was a problem, particularly where MorphoTrust argued (and presented evidence to support its argument) that its product was comparable in quality and more affordable. *See supra* note 28.[55] It was the Board's job to evaluate the evidence presented by the parties, make findings to resolve the factual disputes raised, and, while giving due regard to the DMV's technical expertise, ultimately to determine if MorphoTrust had proved by a preponderance of the evidence that a laser-engraved polycarbonate card did not reflect the District's minimum needs. This court's function in this appeal, in turn, is not to prejudge the answer to that question. The defect we identify is the Board's failure to conduct

---

[54] In the agency report, the District repeatedly and conclusorily referred to the District's "singular security needs as the nation's capital," a catchphrase it repeats on appeal. But the District never explained what those "singular" needs are, and it is far from obvious to this court why the District's security needs *vis a vis* driver's licenses and other non-driver identity cards are appreciably different from the needs of other states. On remand, the District will have to explain those security needs to the Board in a way it has not done so far.

[55] Indeed, the District concedes in its brief to this court that, as to the justification for the specification of polycarbonate, there was "evidence supporting both sides" before the Board.

the necessary comprehensive evaluation of the RFP, one that it must rectify on remand.

## 2. *Fencing*

We likewise determine that the Board's review of the fencing requirement in the RFP was inadequate. The Board concluded that this requirement was "reasonable particularly because the manufacturing facilities will contain confidential information and the District may rationally require the same level of security at the proposed manufacturing facility as exists currently at its DMV facilities." Once again, the question before the Board was not whether the DMV's decision was "rational," or reasonable, but whether the decision to include a fencing requirement reflected a minimum need—i.e., whether there was no other equally effective methods to assure security. And once again, there were factual issues that the Board never considered or resolved. MorphoTrust challenged the assertions in the Agency Report that the DMV used fencing at all its facilities and that industry standards required outdoor fencing. (Although the District filed a Reply with the Board, it never responded to MorphoTrust's arguments.) It was error for the Board simply to accept the District's unsubstantiated representations that fencing was a necessary security feature. Rather, it was the Board's job to

evaluate the evidence proffered, require any testimony or additional documentary proof it deemed necessary, and determine whether DMV properly or improperly included fencing as a limiting specification in the RFP.

*       *       *

As detailed above, the Board did not fulfill its statutory and regulatory obligations (1) to review the challenged specifications in the DMV's RFP de novo, (2) to assess the market research and other materials proffered as evidence by the parties and resolve any disputes of fact, and (3) in this manner, to determine if the challenged specifications reflected the agency's minimum needs and thus were justified under the statute. We therefore reverse the order of the Superior Court, with orders to vacate the opinion of the Board and remand for proceedings not inconsistent with this opinion.[56]

---

[56] If the Board in fact determines that the DMV did not draft the RFP in accordance with the statutory and regulatory requirements, the Board is authorized not merely to *recommend* that the DMV redraft the RFP, as MorphoTrust requested in its initial protest, but to *order* it to do so. *See* 27 DCMR § 314.1 (c), (d), (f) (setting forth the remedies that the Board may "order" a contracting agency to take following a successful protest, including "[i]ssu[ing] a new solicitation," "[r]ecompet[ing] the contract," and "[t]ak[ing] other such action . . . as the Board may direct"). *See also* D.C. Code § 2-360.08 (f) (permitting the Board to "order,"

(continued…)

*So ordered.*


FARRELL, *Senior Judge*, concurring: I join Judge Easterly's opinion and, in particular, its interpretation of the Board's statutory "de novo" review obligation because, far from being unusual, that reading comports with the meaning of administrative review in analogous settings where the underlying statute provides "clear and specific directives" to govern agency action. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 411 (1971). Here, the PPRA and its implementing regulations clearly enjoin District agencies to formulate minimum procurement needs "in a manner designed to promote competition to the maximum extent possible." 27 DCMR § 2500.2 (1988). The Board's review obligation, therefore, is "to conduct . . . a searching and careful evaluation of both the process the agency has followed in determining [its] minimum needs and the evidence proffered to support its judgment of what the needs are." *Ante* at 28-29.


This level of scrutiny does not require, or even allow, the Board to disregard "subjective decisionmaking" by agency officials, *post* at 54 (dissenting opinion), that rests on technical or scientific expertise which the Board does not possess.

(…continued)
"[i]n addition to other relief," that a contract be terminated if a protest is sustained).

Specialized knowledge will underlie RFP specifications in many of the cases coming before the Board on bid protest, and the Board's review must inevitably give recognition, even deference, to minimum need requirements reflecting that kind of knowledge. But awareness of the superior vantagepoint of agencies on technical and specialized procurement matters does not license the inertia — "the essentially hands-off deference to 'reasonable' RFP specifications," *ante* at 26 — that marks the Board's review in this case so far. In remanding for the Board "to conduct the necessary comprehensive evaluation of the RFP," *ante* at 35-36, we do not prejudge the outcome, but give the Board's statutorily defined review function its natural meaning.

BLACKBURNE-RIGSBY, *Associate Judge*, dissenting: While it may well be that the Department of Motor Vehicles ("DMV") failed to conduct an adequate market survey in accordance with the procedural requirements of the Procurement Practices Reform Act of 2010 ("PPRA")[1] to support the challenged "minimum needs" itemized in its solicitation for new driver's licenses, thereby warranting a remand, I cannot agree with the majority's legal analysis and proposed framework for the Contract Appeals Board's ("Board") review of agency solicitations going

---

[1] *See* D.C. Code §§ 2-351.01 to -362.02 (2012 Repl.).

forward.[2] The majority's opinion departs not only from the Council of the District of Columbia's ("D.C. Council" or "Council") legislative intent, but also from the Board's own interpretation of its standard of review, and, as the majority readily concedes, from government procurement norms in the federal context.[3] A full reading of the legislative history of the PPRA does not support such a rigid interpretation of "de novo" review. Rather, as explained more fully below, a "dual-inquiry," whereby an agency is accorded deference to its discretionary decision-making, but where the Board reviews "anew" the agency's adherence to the procedural safeguards of the PPRA, is a more reasonable interpretation of "de novo" review in this administrative context. Such a "dual-inquiry" review is

---

[2] Whether the DMV in this case complied with the procedural requirement to conduct adequate market research, and whether the Board vigorously enforced that and other procedural requirements, are issues that must be decided under the appropriate legal framework. I do not answer these questions here; rather, I dissent from the proposed legal framework on which the majority relies to conclude that a remand in this case is necessary. Contra *ante* at 30 n.50.

[3] *See Grumman Data Sys. Corp. v. Widnall*, 15 F.3d 1044, 1046 (Fed. Cir. 1994) ("Government agencies are entrusted with a good deal of discretion in making procurement decisions . . . . Therefore, in reviewing procurement decisions, a board may not second guess an agency's procurement decision and/or substitute its own judgment for that of the government."); *Impresa Construzioni Geom. Demenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) ("[C]ourts have recognized that contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." (citations and internal quotation marks omitted)) ("*Impresa*").

"searching and careful,"[4] and not toothless, and is consistent with how some courts have previously interpreted "de novo" review in similar administrative contexts. Therefore, I must respectfully dissent.

Relying primarily upon Black's Law Dictionary, the majority adopts a rigidly literal interpretation of the Board's "de novo" review in the context of pre-award bid protests under the PPRA. *See* D.C. Code §§ 2-360.03 (a), -360.08 (d); 27 DCMR § 101.7. Such a rigid reading of "de novo" review, which authorizes the Board to reject specifications within a solicitation as not reflective of the agency's "actual minimum needs," even if the agency presented a reasonable basis for their inclusion,[5] is inconsistent with the legislative intent of the statute. The

---

[4] *Cf. Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated by Califano v. Sanders*, 430 U.S. 99 (1977), where the Supreme Court referenced the nature of its review as "searching and careful" in the context of explaining a deferential standard where "[t]he [reviewing body] is not empowered to substitute its judgment for that of the agency."

[5] Although the majority attempts to blunt its definition of "de novo" review by later explaining that "this is not to say" that the Board may give *no* "recognition" or "weight" to agency expertise reflected in its articulation of its own minimum needs, this "recognition" or "weight" is not equivalent to according legally-binding "deference" to an agency's decision-making. *Ante* at 28. The majority's opinion argues that the "Board's obligation [is] to determine whether the challenged card specifications *in fact* reflected the District's minimum needs," regardless of whether the challenged specifications were reasonable. *Id.* at 33 (emphasis added). In contrast, according "deference" to the agency requires that the Board, upon conducting a "searching and careful" review, must affirm the

(continued…)

D.C. Council recognized in adopting the PPRA that agencies have subjective discretion in making procurement decisions. Further, one of the fundamental goals the Council had in revising the District's procurement statute was to promote increased efficiency, along with maximizing competition, in the procurement process. *See* D.C. Council, Report on Bill 18-610, the "Procurement Practices Reform Act of 2010" at 5 (Oct. 21, 2010) (stating that in order for procurement officials to make the most strategic purchasing decisions, procurement rules must remain flexible). For these reasons, and others, I disagree with the majority that "de novo" review in this context should be so narrowly and rigidly construed. An alternative interpretation of the "de novo" review language in the PPRA, recognizing the nature of the dual-inquiry that the Board must undertake, is more

---

(…continued)
agency's determinations of its own "minimum needs," so long as there is a rational or reasonable basis for their inclusion, and so long as the agency complies with the procedural requirements and safeguards in the Act. *See, e.g.*, *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (stating that the court must sustain an agency action *unless* the action does not "evince[] rational reasoning and consideration of relevant factors"). For this reason, merely giving "recognition" or "weight" to the agency's expertise and discretion in interpreting "de novo" review amounts to a nondeferential standard of review.

The majority also asserts that while the Board's review "is at every stage de novo, as a procurement moves forward, more agency discretion is built into the process." *Ante* at 32. This assertion seemingly contradicts the majority's interpretation of "de novo" review, and lends support to a dual-inquiry approach, and a less rigid interpretation of the "de novo" review standard in the context of the procurement process.

reasonable, based on a holistic, full reading of the legislative purposes of the District's procurement statute.

## I.      Standard of Review

To begin, there is no dispute that the issue in this case is the appropriate interpretation of the term "de novo" as it pertains to the Board's review of agency procurement decisions under the PPRA and associated regulations. *See* D.C. Code §§ 2-360.03 (a), -360.08 (d); 27 DCMR § 101.7. However, I must disagree with the majority's conclusion that the Board's review *must* be nondeferential, and I further disagree with the majority's presumption that a rigidly literal interpretation of "de novo" review is the only way to accomplish the PPRA's "pro-competition bent." Given the importance of the Board's standard of review in effectuating the legislative intent of the PPRA, I believe our analysis must necessarily go further.

Although it is well-established that this court will look first to the "plain meaning" of a statute in determining whether the language is "clear and unambiguous," we have likewise cautioned that we "must not make a fetish out of plain meaning nor should [we] make a fortress of the dictionary." *District of*

*Columbia v. Place*, 892 A.2d 1108, 1111 (D.C. 2006) (citations and internal quotation marks omitted). Thus, we "may refuse to adhere strictly to the plain language of a statute in order to effectuate the legislative purpose as determined by a reading of the legislative history or by an examination of the statute as a whole." *Id.* (quoting *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 754 (D.C. 1983) (en banc)). Consequently, as this court has previously cautioned, "even where words of a statute have a 'superficial clarity,' a review of the legislative history or an *in-depth consideration of alternative constructions* that could be ascribed to statutory language may reveal ambiguities that the court must resolve." *Peoples Drug Stores*, *supra*, 470 A.2d at 754 (emphasis added). A review of the PPRA as a whole, along with its legislative history, reveals several concerns with maintaining a rigid, dictionary definition of "de novo" review in the context of bid protests that the majority has failed to address or consider.

## II.     The PPRA and its Legislative History

To clarify, the present statutory language describing the Board's standard of review as "de novo" originated in the PPRA's predecessor, the District of Columbia Procurement Practices Act of 1985 ("1985 Act"), and was not new language added to the revised PPRA to support — what the majority characterizes

as — its inherently "pro-competition" bent. Specifically, the 1985 Act established the current Board and stated that, under Section 903 (Jurisdiction of the Board), "[t]he Board shall be the exclusive hearing tribunal for, and shall have jurisdiction to review and determine de novo . . . [a]ny protest of a solicitation or award[,]" and, under Section 908 (Protest of solicitations or awards to the Board), "the Board shall promptly decide whether the solicitation or award was in accordance with the applicable law, regulations, and terms and conditions of the solicitation. The proceeding shall be de novo." D.C. Council, Report on Bill 6-191, "District of Columbia Procurement Practices Act of 1985" at 56, 60 (Oct. 10 1985). These two sections of the 1985 Act track almost verbatim with the current statutory language found in D.C. Code § 2-360.03 (a) and D.C. Code § 2-360.08 (d), respectively, and which forms the basis for the majority's holding.[6] Rather than the "de novo" review language being inextricably linked to the statutory goal of promoting competition, as the majority contends, it is wholly unclear from reading the nearly thirty-year old statutory provisions just what extent of "de novo" review authority

---

[6] *See* D.C. Code § 2-360.03 (a) ("The Board shall be the exclusive hearing tribunal for, and shall review and determine de novo . . . [a]ny protest of a solicitation . . . ."); D.C. Code § 2-360.08 (d) ("[T]he Board shall decide whether the solicitation . . . was in accordance with the applicable law, rules, and terms and conditions of the solicitation. The proceeding shall be de novo . . . ."); *see also* 27 DCMR § 101.7 ("The Board shall hear and decide, de novo, all cases under its jurisdiction.").

the legislature actually intended the Board to have in reviewing bid protests.[7] In fact, nowhere in the 1985 Act legislative report does the D.C. Council explain its "de novo" word choice. Rather, on the issue of establishing the Board, the Council observed that the Board's predecessor was "established by executive order, and the functions for the Board as provided in the bill are similar to the current functions and authority of the [predecessor] Board . . ." *Id.* at 5.

The current PPRA was proposed in 2010 as a direct response to significant flaws identified in the District's procurement system.[8] *See* Report on Bill 18-610, *supra*, at 3. Although one of the systematic flaws recognized was the need for improved fairness and "accountability and oversight," as indicated by the majority, the D.C. Council also identified a second, equally fundamental interest: the need

---

[7] Nor am I persuaded by the majority's argument that the Council must have inherently understood the meaning of the "well-established" term "de novo," apparently meaning nondeferential review, when it adopted the language in the 1985 Act. *Ante* at 27 n.46. This is because "de novo" has been interpreted differently by courts in the past, especially in the context of reviewing agency decisions. See *infra* at 60.

[8] Areas requiring improvement that the PPRA intended to address included, among others: (1) developing a professional acquisition workforce; (2) enhancing transparency through an open and transparent process; (3) uniformity of procurement policies; and (4) source selection integrity. *See* Report on Bill 18-610, *supra*, at 8-23. These specific areas of improvement were intended to support the twin fundamental goals of the PPRA: fairness *and* efficiency. *Id.* at 5.

to improve government efficiency in the procurement process. *Id.* at 4.[9] The

Council noted that "fairness and efficiency are not inherently opposing interests,"

but conceded that "an ever-increasing number of procedural steps to ensure

fairness imposes limits on the push towards greater efficiency . . ." *Id.* at 5.

Accordingly, the Council sought to balance, in the PPRA, increased procedural

steps to guarantee a "fair" procurement process with "flexible" procurement rules

that "*allow procurement officials to make the most strategic purchasing decisions*

— i.e., those that are in the best interest of the government as a purchaser[,]"

recognizing that "[d]ifferent goods and services require different procurement

structures, methods, and timeframes." *Id.* (emphasis added). The Council further

acknowledged and, in fact, endorsed the notion that "most procurement decisions

involve a significant degree of *subjective decision-making*, either in the description

of goods or services needed, the nature of a contract vehicle to be used, or the

weight given to various ranking criteria." *Id.* (emphasis added). The Council

explained that "[t]he need for subjective decision-making should not be cause for

concern [as] [i]ndependent decision making is part of *all* procurements and a

---

[9] Specifically, the Council stated that: "The ability to procure goods and services in a timely and cost-efficient manner ensures that organizations have the resources they need to fulfill their institutional missions. Delays impede performance and often lead to increased costs, limiting the ability of an organization to achieve its mission." *Id.* at 4.

fundamental tenet of the most successful procurement organizations[,]" referring to the Government Accountability Office ("GAO") and the federal procurement system. *Id.* at 5 n.2 (emphasis added).

In fact, in revising the District's procurement law, the D.C. Council looked to the findings of the GAO on the District's procurement system, *see id.* at 7, an agency whose expertise the majority perfunctorily discarded as irrelevant to construing the District's statute.[10] The Council further endorsed the GAO's statement that "one of the fundamental challenges to the federal procurement system" is that "[g]overnment contracting officials [are] confronted with numerous mandates that left little room for the *exercise* of sound business judgment, initiative, and creativity in satisfying the needs of their agency customers." *Id.* at 5 n.2 (emphasis added). Accordingly, the Council concluded that "[a] good procurement system will rely on well-qualified decision-makers and *empowers those individuals* to make strategic buying decisions." *Id.* (emphasis added). In this regard, the majority's rigidly literal interpretation of "de novo" review

_____

[10] Given that the Council looked to the GAO's findings on the shortcomings within the District's then-existing procurement statute, the majority perhaps too hastily brushed aside the District's attempt to argue for an alternative reading of "de novo," based on the standard of review adopted by the GAO and the former General Services Agency Board of Contract Appeals ("GSBCA"), by asserting simply that the federal frameworks were inapplicable.

eliminates deferential consideration of the discretionary decisions that agency officials have the expertise and authority to make. Further, the majority decision ignores the reality that most procurement actions involve some discretionary and subjective decision-making, which is within the purview and responsibility of agency officials.[11]

Illustrating the D.C. Council's goal in seeking to improve procurement efficiency through recognition of agency discretion, the PPRA legislative report actually recommended that the D.C. Council, which then may have been the only "state-level legislature authorized to routinely disapprove contracts[,]" limit its *own* power to review and reject contracts, because, while such a review clearly increases oversight over the agencies, it "place[d] an increased burden on the [District agencies] by adding a potentially lengthy step to the procurement process." *Id.* at 20.

---

[11] The majority contends that the statutory language "[a]ny prior determinations by administrative officials shall not be final or conclusive," D.C. Code § 2-360.08 (d), supports a rigid definition of "de novo" review by the Board. *Ante* at 23. However, this statutory language is not in conflict with according deference to the agency's determination of its minimum needs because the Board clearly retains the authority to reject an agency's "minimum needs" if there is no rational basis for their inclusion. *See infra* at 66-67.

Thus, in addition to the "central purposes" of the PPRA identified by the majority,[12] there are also competing "central purposes" within the PPRA intended to "maximize efficiency." For example: (1) "promot[ing] efficiency and eliminat[ing] duplication in the District government procurement organization and operation to reduce costs;"[13] (2) "provid[ing] increased economy in procurement activities and maximiz[ing], to the fullest extent practicable, the purchasing power of the District government;"[14] and (3) "provid[ing] for timely, effective, and efficient service to District agencies and individuals doing business with the District government[.]"[15]

---

[12] Including: (1) "foster[ing] effective and equitably broad-based competition in the District[,]" D.C. Code § 2-351.01 (b)(2), (2) "obtain[ing] full and open competition by providing that contractors are given adequate opportunities to bid[,]" *id.* at (3), (3) "increase[ing] public confidence in the procedures followed in public procurement[,]" *id.* at (5), and (4) specifying procurement needs "in a manner designed to promote competition to the maximum extent possible[,]" 27 DCMR § 2500.3.

[13] D.C. Code § 2-351.01 (b)(6).

[14] *Id.* at (7).

[15] *Id.* at (9).

### III.   Discussion

Based on the legislative history of the PPRA, the majority's rigid interpretation of "de novo" review is in conflict with a holistic reading of the *full* legislative intent of the PPRA for two reasons.

#### A. *The Agency's Right to Make "Subjective" Procurement Decisions*

First, an interpretation of "de novo" review that rejects according deference to the agency's discretionary procurement decisions made within its expertise is incongruent with the D.C. Council's recognition that "most procurement decisions involve a significant degree of subjective decision-making," and the Council's further endorsement that "[i]ndependent decision making" by a procuring agency is a "fundamental tenet of the most successful procurement organizations."  Report on Bill 18-610, *supra*, at 5 & n.2.  This is consistent with federal procurement case law, which recognizes that "[c]ontracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process . . . [and] [f]or that reason, procurement decisions invoke highly deferential rational basis review."  *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d at 1282, 1286

(Fed. Cir. 2010) (citations, internal quotation marks, and original brackets omitted).

Given the D.C. Council's expressed legislative intent in enacting the PPRA, we must do a more probing analysis, which goes beyond Black's Law Dictionary, and examine whether conferring a nondeferential review to the Board is functionally appropriate in the context of bid protests. In doing so, it is helpful to consider, fundamentally, the types of issues typically reviewed under a "de novo" versus an "abuse of discretion" standard.[16]

By way of analogy, in the criminal context, we review sufficiency of the evidence challenges "de novo" because the evidence "objectively speaking" lends itself to a specific result. The evidence is enough to convict or it is not; there is no

---

[16] This court's cases regarding government immunity also provide us with some guidance. In *Casco Marina Dev., L.L.C. v. District of Columbia Redevelopment Land Agency*, 834 A.2d 77, 81 (D.C. 2003) ("*Casco Marina*"), we explained why government officials' discretionary actions were conferred immunity, whereas "ministerial" actions by government officials were not. We defined "discretionary acts" as involving the formulation of "policy;" choices that require "personal deliberation, decision, and judgment," amongst many alternatives. *See id.* at 81 & n.7. In contrast, ministerial actions, as explained by the Supreme Court in *Berkovitz v. United States*, 486 U.S. 531, 536 (1988), are those where a statute or regulation "specifically prescribes a course of action for an employee to follow."

room for discretion on the legal question of whether the evidence was enough to convict the individual of the charged offense.[17] On the other hand, admissibility of evidence determinations are reviewed under an abuse of discretion standard because we acknowledge and respect the discretionary aspect of assessing whether something is more probative than prejudicial under the circumstances of each case, and we allow the trial court the flexibility to make that choice, within certain parameters. Likewise in the civil context, we review motions to dismiss and motions for summary judgment "de novo" because the party has either pleaded all of the elements of the claim or raised an issue of material fact, or has not; there is no in-between.[18]

---

[17] Of note, even within the sufficiency of the evidence context, it is well-established that we "defer" to the trial court's factual findings. *See, e.g.*, *Lewis v. United States*, 767 A.2d 219, 222 (D.C. 2001) ("*Deference* must be given to the factfinder's duty to determine credibility, weigh the evidence, and draw justifiable inferences of fact." (emphasis added)).

[18] In fact, this concept of deference being accorded to discretionary acts was explained and clarified by this court over thirty-years ago, where we expounded that "[d]iscretion signifies choice.[,]" and that "[t]he concept of 'exercise of discretion' [therefore] is a review-restraining one." *Johnson v. United States*, 398 A.2d 354, 361-62 (D.C. 1979). We explained that a review of discretionary decisions must be "supervisory in nature and *deferential* in attitude." *Id.* (emphasis added).

Simply put, the flaw in the majority's interpretation of "de novo" review in this context is that it permits the Board to attempt to "objectively" determine the "actual minimum needs" of the DMV's solicitation for new driver's licenses. The underlying assumption is that there is only one correct answer as to what constitutes an agency's "actual minimum needs" for any given solicitation. Yet, in reality, the agency must utilize its expertise and discretion, and make policy determinations in identifying and developing its "minimum needs." The legislative history of the PPRA recognizes that agencies have *subjective* decision-making authority over procurement matters. *See* Report on Bill 18-610, *supra*, at 5.

Moreover, the D.C. Council's characterization of an agency's procurement decisions as "discretionary" in nature is reasonable. The agency — not the Board — has the expertise and the subjective decision-making authority on behalf of the District government to determine, within reason, the District's "minimum needs" for any given procurement solicitation. Thus, it is not for the Board to second guess such determinations unless the agency's decision was lacking in rationale.[19] *See Savantage Fin. Servs., Inc.*, *supra*, 595 F.3d at 1286. For essentially the same

---

[19] Of course, the agency must adhere to the *procedural* procurement guidelines as outlined by the PPRA, such as conducting adequate market research. *See* 17 DCMR § 2500.2.

reason, "competitors do not dictate an agency's minimum needs, the agency does . . . . And determining an agency's minimum needs is a matter within the broad discretion of agency officials . . . ." *Id.* (citations and internal quotation marks omitted).

Under the majority's proposed legal framework, will the Board be allowed to reject an agency's procurement specification for a new asphalt road because the Board determines that asphalt is not an "actual minimum need" when a brick road would do just as well? Or, could the Board reverse a solicitation embodying the District's policy preference to power District government buildings via solar panels because the Board determines it is not a "minimum need" when clean coal would do just as well?

In the case at hand, putting aside for the moment the sufficiency of the market research study conducted by the DMV in this case, had the DMV determined, following required procurement procedures, that it "preferred" to move the District toward polycarbonate cards, is the Board free to discard the DMV's requirement as unnecessary and not an "actual" minimum need? Does the majority's opinion mean that the DMV cannot make a policy choice regarding

driver's licenses?  This result seems to run counter to one of the essential policy making functions of the government.[20] *Cf. Casco Marina*, *supra* note 16, 834 A.2d at 81 (conferring immunity onto government actions exhibiting a discretionary function because it is a matter of making a policy choice).

### B. The PPRA was Intended to Promote Competition AND Increase Efficiency in the District of Columbia's Procurement Process

Second, the majority's interpretation of "de novo" review undercuts one of the PPRA's "central" goals of increasing efficiency in the procurement process. The legislative history underscores this point by noting that the D.C. Council

---

[20]  The majority attempts to downplay the impact of its holding by stating that it "merely" intends to hold that "when agencies identify their minimum needs, they must be able to justify them before the Board." *Ante* at 30 n.50.  Yet, the opinion later seemingly contradicts this statement by explaining that "the question before the Board *was not* whether the DMV's decision was 'rational,' or reasonable, but whether the decision . . . reflected a minimum need — i.e., whether there was no other equally effective methods . . . ." *See id.* at 36 (emphasis added).  Consequently, it is evident that the majority's opinion requires the agency to do more than "merely" "justify" its minimum needs to the Board.  Instead, the majority imposes on the agency the burden of presenting definitive evidence that there were no equally effective alternatives.  However, there are many instances where there may be multiple options, none of which are inherently superior to the other.  Accordingly, when an agency decides to choose one of those options as a "minimum need," and presents a reasonable basis for its inclusion, such as, for example, the desire to utilize solar energy over coal or gas, the agency is essentially making a policy decision for the District of Columbia, which is not for the Board to second guess.  *Cf. Casco Marina*, *supra* note 16, 834 A.2d at 81.

sought to remove or limit its *own authority* to review certain contracts due to the hindrance on efficiency. *See* Report on Bill 18-610, *supra*, at 20-21. As the majority notes, the GSBCA *had* a "de novo"-like standard of review, see *ante* at 25 n.45, (although the GSBCA still accorded some deference to the agency), but this standard was modified into a more explicit deferential standard by 1996, the year the GSCBA's authority was terminated. *See Nat'l Defense Authorization Act for Fiscal Year 1996*, Pub. L. No. 104-106 (Feb. 1996). What the majority does not note, however, is that, in large part, the reason for this change in review standard was because the GSBCA's "de novo"-like review caused higher instances of excessive litigation and sustain rates than the GAO,[21] and that this contributed greatly to Congress's decision to revoke the GSBCA's jurisdiction. *See* Keyes, *supra* note 21, at 754 n.2; Jonathan R. Cantor, Note, *Bid Protests and Procurement Reform: The Case for Leaving Well Enough Alone*, 27 PUB. CONT. L.J. 155, 171 (1997) ("The . . . Committee's . . . proposal, to eliminate the GSBCA's de novo review, contributed to Congress's decision to revoke the GSBCA's bid protest jurisdiction . . . ."). The majority's adoption of an even *more* rigid standard of

---

[21] According to Government Contracts by W. Noel Keyes, historically, protest sustain rates were fifteen-percent higher for cases going before the GSBCA than the GAO because of the GSBCA's "de novo" standard of review. W. Noel Keyes, GOVERNMENT CONTRACTS 753 (3d ed. 2003). This "de novo" standard also contributed to an "unacceptable" forty five-percent protest rate in all information technology procurements over $25 million. *Id.* at 754 n.2.

review than the GSBCA undercuts the D.C. Council's intent to promote efficiency within the procurement process.

Although the D.C. Council, in enacting the PPRA, found fault with many issues pertaining to the District's previous procurement statute, concern about the strength of the Board's reviewing power was not one of them. In the PPRA legislative report, the D.C. Council conducted a systematic assessment of the weaknesses within the 1985 procurement act. When it came to the Board, however, the D.C. Council explicitly stated that it believed "the current protest procedures in the PPA [i.e., 1985 Act] are sufficient to handle cases deemed frivolous." Report on Bill 18-610, *supra*, at 19. In fact, reading the report, it appears that the D.C. Council's main concern with the Board was *not* that its review lacked bite, as the majority has opined, but rather the complete opposite — the D.C. Council sought to place *more* measures in place to restrict vendors from bringing forth "frivolous" claims that would hamper the procurement process. *Id.*[22]

---

[22] In fact, a bill was introduced to require vendors wishing to challenge a contract determination before the Board to place a "protest bond" equivalent to five-percent of the protested contract's value. *See* Report on Bill 18-610, *supra*, at 19. Such a bond would then be forfeited if the protest was deemed to be found without merit. *Id.* This proposal failed, however, because the Board's Chief

(continued…)

This legislative history rebuts the majority's assertion that the PPRA *intended* for the Board to have a rigid and wholly nondeferential standard of review, and that the Board's current review practices, which give deference to agencies are erroneous. Instead, the D.C. Council explicitly stated that it found the current protest procedures (and therefore the Board's interpretation of its own standard of review, which gives deference to the agency) to be adequate, and that — if anything — the D.C. Council sought to prevent more vendors from challenging agency solicitations. The majority's holding, which overrides the Board's interpretation of its own standard of review and instead requires it to review agency solicitations without conferring deference to the agency, contradicts the Council's expressed intent and hinders the goal of preventing vendors from bringing "frivolous" protests.[23]

---

(…continued)

Administrative Judge indicated that it had "not ruled a large number of cases to be frivolous and thus saw the provision as unnecessary." *Id.*

[23]    During the public hearing on the PPRA, some Council members "questioned the necessity of the Contract Appeals Board" because "a [B]oard is unusual and that in most states[,] protests are adjudicated by the procurement office." Report on Bill 18-610, *supra*, at 32. Again, this contradicts the majority's conclusion that the so-called "plain meaning" of the PPRA's "de novo" language denoted that the Act intended to grant the Board *more* review authority over agency procurement decisions.

### C. Historical Acceptance of an Alternative Interpretation of "De Novo" Review

Of course, I do not mean to suggest that we should read the statute as if the words "de novo" do not exist. "Each provision of the statute should be given effect, so as not to read any language out of a statute whenever a reasonable interpretation is available that can give meaning to each word in the statute." *Providence Hosp. v. District of Columbia Dep't of Emp't Servs.*, 855 A.2d 1108, 1114 (D.C. 2004) (citations and internal quotation marks omitted). What I am suggesting, however, is an alternative interpretation of "de novo" review, which gives effect to the statutory purpose by deferring to an agency's exercise of its discretion while ensuring that procedural safeguards are enforced, is reasonable here. Federal courts have interpreted federal administrative statutes requiring "de novo" review, or an equivalent type of review, to require a reviewing body to give deference to an agency's reasonable discretionary decision, while requiring adherence to procedural safeguards.

In *Board of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176 (1982), the Supreme Court was called upon to interpret the appropriate standard for reviewing challenges arising under The Education of the Handicapped Act ("Education Act" or "Act"), then-20 U.S.C. § 1401 *et seq.* (1976

ed. and Supp. IV). The Act provided federal assistance for educating children with disabilities, and required state education boards receiving assistance to craft an "individualized educational program" ("IEP") for each disabled child, consisting of programming and teaching goals specific to the unique characteristics of the child. *Id.* at 181-82. Complaints pertaining to an IEP must be filed with the state's educational agency but can be appealed to any state or federal court, whereby the reviewing court shall, pursuant to the Act, "receive the record of the state administrative proceedings, shall hear additional evidence at the request of a party, and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Id.* at 183, 204-05 (citation, internal quotation marks, and brackets omitted). On petition for writ of certiorari, the Supreme Court concluded that the statutory language, although not specified as a "de novo" review, nonetheless was more in line with the de novo standard. *Id.* at 205-06. However, the Court explained that this was, by "no means[,] an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* at 206. Rather, given the "elaborate and highly specific" procedural safeguards of the Act, *id.* at 205, the Court reasoned that "the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of *substantive* content in an IEP." *Id.* at 206 (emphasis added).

Subsequently, some federal courts have characterized this review articulated by the Supreme Court as a "modified de novo" standard, *see Karawia v. United States Dep't of Labor*, 627 F. Supp. 2d 137, 144 (S.D.N.Y. 2009), whereby the review, while "de novo, [] is tinged with a significant degree of deference to the state educational agency, as [the courts] are essentially acting in an administrative law-style capacity." *Id.* In practice, this "modified de novo" standard means that the reviewing court shall assess two questions: "(1) whether the state complied with the procedural requirements of the [Act], and (2) whether the challenged IEP was '*reasonably* calculated to enable the child to receive educational benefits.'" *P. Ex. Rel. Mr. & Mrs. P. v. Newington Bd. of Educ.*, 546 F.3d 111, 118 (2d. Cir. 2008) (emphasis added); *see also Rawley*, *supra*, 458 U.S. at 206-07. The first question is an objective one pertaining to procedural safeguards (much like a "ministerial act" in the context of government immunity, *see supra* note 16), and therefore obviously can be reviewed "de novo" by a reviewing tribunal. *See, e.g.*, *Rawley*, *supra*, 458 U.S. at 206 n.27. However, the second question — e.g., whether the state board "reasonably calculated" the IEP to enable the child to be educated in "the least restrictive environment" — is essentially a fact-specific, and therefore deferential, inquiry. *P. Ex. Rel. Mr. & Mrs. P.*, *supra*, 546 F.3d at 119-20. Accordingly, as the Supreme Court held, "once a court determines that the requirements of the Act have been met, questions of *methodology* are for resolution

by the States." *Rawley*, *supra*, 458 U.S. at 208 (emphasis added). This approach is essentially consistent with the District of Columbia's Contract Appeals Board's current approach, as specified in *Protest of Koba Associates, Inc.* DCCAB No. P-325-A (Mar. 12, 1993), where the Board characterized its own standard of review as the following:

> [I]n applying the de novo standard of review, [the Board] do[es] not presume that the agency's actions were correct. . . the *substantive standards* which [the Board] will apply are that [it] will not take issue with an agency's narrowing of competition in pursuit of legitimate agency needs, but . . . will overturn those requirements that improperly limit competition. . . . Of course, [the Board] will accord deference to the agency's technical judgment but will not slavishly follow it where the result is lacking in justification.

*Id.* at *6 (emphasis added) (citations omitted).

The second example is even more analogous, even though it is in the post-contract award stage, pertaining to the Contract Dispute Act ("CDA") of the federal government. In *Todd Construction, L.P. v. United States*, 88 Fed. Cl. 235 (2009), the Court of Federal Claims was asked to interpret the then-CDA provision, 41 U.S.C. § 609 (a)(3) (1994 Supp.), regarding the appropriate judicial review of challenged performance evaluations of vendors who have a contract with the United States government. *Id.* at 245. Section 609 (a)(3) explicitly stated that the court was to review such evaluations "de novo." However, the Federal Claims

court did not read the language so literally and instead created two distinct sets of requirements. *Id.* at 246. The court explained that:

> One [set of inquiries related to performance evaluations] is strictly procedural: there are a number of acts that are not within the discretion of the contracting officer. She *must* prepare an evaluation, using a particular form, at a particular time. Where an unsatisfactory evaluation is contemplated, she *must* confer with the contractor, send a notice of intent to issue an unsatisfactory interim rating, allow written comments by the contractor, include them in the report, *et cetera.* The Court is fully capable of reviewing whether these requirements were satisfied or not on a *de novo* basis. The Court possesses the capacity to determine whether a conference was held or whether a notice of intent to issue an unsatisfactory rating was sent in a timely fashion.

> But the second issue is a different matter. The regulations contemplate that the contracting officer and the reviewing officer will produce a performance evaluation that is "accurate" and "fair." That is, although the issuance of a performance evaluation that is "accurate and fair" can be expected "as a matter of right" by the contractor, the determination of the proper rating (*i.e.,* what is "accurate and fair") is a matter for the agency to decide within broad parameters.

> The choice of a particular rating to assign is necessarily subjective and is within the sole purview of the Government. Thus, the production of an accurate and fair performance evaluation rating requires the exercise of the contracting officer's judgment[.]

*Id.* at 246-47 (italics in original).

These two examples of an alternative interpretation of "de novo" review within the context of administrative statutes are consistent with a holistic reading of the *full* legislative intent underlying the PPRA.[24] *See* Report on Bill 18-610, *supra*, at 5. Accordingly, the PPRA's "de novo" review should be interpreted as requiring a "dual-inquiry," balancing the need for maximizing competition and fairness and transparency, with efficiency and the due recognition that government agencies are qualified, authorized, and required to make certain discretionary and subjective choices in the context of procurement decisions.

---

[24] In fact, this "dual-inquiry" is also present in the federal bid protest context notwithstanding that, as the majority notes, there is no statutorily established "de novo" review. As the Federal Circuit explained, "a bid award may be set aside if either: (1) the procurement official's *decision* lacked a rational basis; or (2) the procurement *procedure* involved a violation of regulation or procedure." *Impresa*, *supra* note 3, 238 F.3d at 1332 (emphasis added). "Accordingly, [in analyzing the first question] the test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion . . . and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Id.* at 1332-33 (citations and internal quotation marks omitted). "When a challenge is brought on the second ground, [however,] the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Id.* at 1333 (citations and internal quotation marks omitted).

## IV. The "Dual-Inquiry" Interpretation of "De Novo" Review

Under a "dual-inquiry" interpretation of the "de novo" language found in the PPRA, the determination of whether a District agency has satisfactorily engaged in the mandated procurement procedures under the PPRA and associated regulations is an objective question, which is appropriate for the Board to analyze on a "de novo," or nondeferential, basis. These mandated procedural requirements include, among many others: (1) the agency *shall* conduct market research, (2) its solicitations *shall* contain specifications and purchase descriptions, *see* 27 DCMR §§ 2500.2, 2500.3, and (3) each purchase description *shall* include characteristics such as "common nomenclature;" "kind of material;" "dimensions, size, or capacity;" etc. 27 DCMR § 2501.5. In reviewing a challenge to the agency's compliance with the procedural safeguards of the PPRA, the Board shall remand the solicitation if the bidder demonstrates a "prejudicial violation" of the PPRA or associated regulations. *Impresa*, *supra* note 3, 238 F.3d at 1333.

The determination of whether an agency has satisfactorily articulated the "minimum needs" for a solicitation, however, is a deferential and subjective inquiry because the agency has broad discretion within a range of acceptable,

reasonable discretionary choices. Therefore, in applying this dual-inquiry, the Board must affirm an agency's determination of its "minimum needs" stipulated within a solicitation, so long as there is a rational basis supporting the minimum needs, along with supporting evidence, and the agency has satisfactorily complied with the mandated procurement procedures. This approach is consistent with the Board's own interpretation of its review standard, *see Koba Assocs., Inc.*, *supra*, at *6, and with established practices within the federal procurement system. *See, e.g.*, *Savantage Fin. Servs., Inc.*, *supra*, 595 F.3d at 1286. This dual-inquiry better balances the competing policy goals of the PPRA, and recognizes the importance of giving agencies discretion over procurement decisions while also requiring compliance with procedural requirements designed to foster fairness, efficiency, and competition.

The majority's observation that the Council identified "implementation" of the previous 1985 Act to be one of the most significant flaws in the District's procurement system, *see* Report on Bill 18-610, *supra*, at 3,[25] reinforces, rather

---

[25] Implementation issues identified included: (1) "a substantial portion of [procurements] known to be in violation of procurement *procedures*[;]" (2) "failure to establish a culture of *compliance* and enforcement of *controls* that insure compliance[;]" and (3) the need to develop a "more robust system of acquisition *planning*," increased "accessibility of procurement *rules and regulations*," and "a

(continued…)

than detracts, from the "dual-inquiry" framework. As noted, under a dual-inquiry framework, the Board reviews "anew" whether the agency's solicitation followed all of the procedural safeguards put into place by the PPRA, and the Board on review must ensure that those procedural requirements are vigorously enforced. As the Council itself explained, the failure to follow the procurement procedures presented the biggest challenge to successful implementation of the District's procurement statute. *See* Report on Bill 18-610, *supra*, at 6-7. Absent from its critique of the District's procurement system, however, is any indication that the Council sought to curtail the subjective decision-making authority of the agencies in crafting procurement solicitations. On the contrary, the Council specifically endorsed the need for independent decision-making on the part of agencies in fashioning the most flexible and beneficial procurement solicitations. A "dual-inquiry" interpretation of "de novo" review gives the Board the authority to review questions of procedural compliance "searchingly," yet accords flexibility and deference to an agency's subjective decision-making on what constitutes its own "minimum needs."

---

(…continued)
more professional, better trained workforce of procurement personnel." *Id.* at 6-7 (emphasis added).

Therefore, I do not agree with the majority's interpretation of "de novo" review in coming to its conclusion that a remand is necessary here. I must respectfully dissent.